JS 44  (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Paul T. Edwards

### DEFENDANTS
North American Power and Gas, LLC

**(b)** County of Residence of First Listed Plaintiff   New Haven
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Fairfield
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Izard Nobel LLP, 29 South Main Street, Suit 305
West Hartford CT 06107
860-493-6294

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
        Plaintiff

☐ 3   Federal Question
        *(U.S. Government Not a Party)*

☒ 4   Diversity
        *(Indicate Citizenship of Parties in Item III)*

☐ 2   U.S. Government
        Defendant

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)                                     and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | Corrupt Organizations |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 480 Consumer Credit |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☒ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | Act |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | State Statutes |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
      Proceeding

☐ 2 Removed from
      State Court

☐ 3 Remanded from
      Appellate Court

☐ 4 Reinstated or
      Reopened

☐ 5 Transferred from
      Another District
      *(specify)*

☐ 6 Multidistrict
      Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(d)

Brief description of cause:
Unfair trade/consumer protection; breach of implied covenant of good faith; unjust enrichment

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION**
   UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE
11/18/2014

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| PAUL T. EDWARDS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NORTH AMERICAN POWER AND GAS, LLC,<br><br>Defendant. | No. 3:14-cv-01714<br><br><br>**CLASS ACTION COMPLAINT** |

1.      Plaintiff Paul T. Edwards ("Plaintiff"), on behalf of himself and all persons similarly situated, by and through his attorneys, alleges as follows.

## INTRODUCTION

2.      Plaintiff Paul T. Edwards brings this action on behalf of himself and a class of all similarly situated customers against Defendant North American Power and Gas, LLC ("NAP") in Connecticut, Rhode Island, New Hampshire and Maine, arising out of NAP's unfair, deceptive, unconscionable and bad faith billing for "supplying" electricity to residential consumers.

3.      NAP entices residential customers to sign up for its service by offering low initial rates for electricity.  When the "teaser rate" period expires, however, customers are rolled over into a month-to-month variable rate plan with exorbitant rates.

4.      NAP represents in its marketing materials and in its contracts that it offers a "variable rate" electricity plan to residential consumers that is tied to the market rate in the wholesale power market.  However, contrary to NAP's representations and obligations, NAP consistently and improperly charges an extraordinarily high premium rate for electricity ***regardless***

of fluctuations in the underlying market price.  Indeed, as set forth below, NAP routinely charges its consumers ***three to four times*** the underlying market rate, notwithstanding NAP's representations that its variable rates "reflect" monthly wholesale electric prices.

5.      Specifically, NAP's rates go ***up*** to match spikes in the underlying market price. However, when the market price goes ***down***, NAP's rate remains at an inflated level several times higher than the market rate.  Through this scheme, NAP subjects consumers to consistent and unlawful "heads I win, tails you lose" pricing.

6.      This unfair and deceptive scheme of charging inflated electric prices that match ***increases*** in the underlying market price while failing to pass-along ***decreases*** is intentionally designed to maximize revenue for NAP.

7.      Plaintiff and other NAP customers have been injured by NAP's unlawful practices. Accordingly, Plaintiff, on behalf of himself and the class, seeks damages, restitution and injunctive relief for NAP's violation of state consumer protection statutes (Count I), breach of the implied covenant of good faith and fair dealing (Count II), and unjust enrichment (Count III).

## PARTIES

8.      Plaintiff Paul T. Edwards is a resident of Cheshire, Connecticut.

9.      Defendant North American Power and Gas, LLC is a limited liability company organized under the laws of Delaware whose principal place of business is located at 20 Glover Avenue, Norwalk, CT 06851.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this civil action under 28 U.S.C. § 1332(d) because this is a class action filed under Rule 23 of the Federal Rules of Civil Procedure, the amount in

controversy exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendant NAP.

11.     This Court has personal jurisdiction over NAP because NAP maintains its headquarters in Connecticut and because NAP has tens of thousands of customers in Connecticut and thereby conducts business in this state.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because NAP resides in Norwalk, Connecticut.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

**A.     Energy Deregulation and the Role of Electric Suppliers**

13.     In the late 90s and early 2000s, many states moved to deregulate at least part of the electricity supply services then performed by large public utilities.  Delivery of electricity to a consumer requires both the creation of electricity and the transmission of that electricity from the power plant to the consumer. The typical pattern was to require the public utilities to divest their power generation assets such as coal, gas and nuclear power plants.  But, the regulated utilities continued distributing power from these power plants to consumers through transmission lines.

14.     When deregulation occurred, the business of power *supply* was opened to competition and consumers were allowed to select the companies from whom they would purchase their power.  However, states generally set a "standard offer," available to all customers in each public utility's service area.  In some states, such as Connecticut, the standard offer is a single, flat rate which is fixed for a period of months, while other states such as Rhode Island have both a fixed rate standard offer and a standard offer rate that varies each month.

15.     As a result of the deregulation of power supply, several different parties are now involved in the supply of electric power to residential consumers.  Certain companies, such as Dominion, produce electric power ("Generation Companies").  Other companies, such as Connecticut Light & Power ("CL&P") in Connecticut, distribute electricity from Generation Companies to the end user ("Distribution Companies").  Although some Generation Companies have sold power directly to consumers, including residential customers, most sell the power they generate on the wholesale market to companies that market to retail customers ("Electric Suppliers").

16.     The market for wholesale power in the New England States is under the administration of an independent, not-for-profit corporation formed in accordance with the recommendations of the Federal Energy Regulatory Commission, called ISO New England (for "Independent System Operator"). ISO New England coordinates and directs the generation and flow of electricity throughout the region, ensuring that electric supply exactly meets demand throughout the network. The wholesale market managed by ISO New England determines where and when electricity will be made by Generation Companies and the wholesale prices that will be paid for that electricity through competitive bids.  "More than 500 companies participate in these markets, buying and selling between $6-$14 billion of electric power and related products annually."  http://www.iso-ne.com/about/what-we-do/three-roles/administering-markets. The bid process determines the Generation Company that will make each unit of electricity and the wholesale price each Energy Supplier will pay to each Generator for each unit of energy delivered to specific locations throughout the region.

17.     Electric Suppliers play a middleman role:  they purchase power directly or indirectly from Generation Companies and sell that electricity to end-user consumers.  However,

4

Electric Suppliers do not *deliver* that electricity to consumers. Rather, Generation Companies deliver the electricity to Distribution Companies, which in turn deliver the electricity to the ultimate consumer. Electric Suppliers merely buy electricity at the wholesale rate and then sell that power to end-users with a mark-up. Thus, Electric Suppliers are essentially brokers and traders: they neither make nor deliver electricity, but merely buy electricity from the Generation Companies and re-sell it to end users.

18.     Like other Electric Suppliers, NAP purchases power on the wholesale market and sells it to consumers. The rates that NAP charges are not approved by states' regulatory authorities such as Connecticut's Public Utility Regulatory Authority ("PURA") or the Public Utilities Commissions ("PUC's") of Rhode Island, Maine or New Hampshire. Rather, NAP and other Suppliers are free to set their own rates for supplying electricity to consumers. And NAP, like all other suppliers, relies upon the Distribution Companies to deliver the electricity it purchases on the wholesale market to its customers. The Distribution Companies charge separately for their distribution-related services, using rates that are reviewed and approved by the states' regulatory agencies.

19.     Electric Suppliers may contract with consumers to supply electricity on either a "Fixed" or "Variable" rate basis. Under a Fixed contract, the Supplier agrees to supply electricity at a set rate for a certain number of months.

20.     Under a Variable rate contract, the Supplier may vary the rate it charges on a periodic basis (often monthly).

**B.       North American Power's Excessive Rates**

21.     NAP has offered various Fixed and Variable rate plans, including contracts that charge a low promotional "teaser" rate which is fixed for a set number of months before automatically rolling into a Variable rate plan.

22.     Throughout its contracts, marketing materials and required disclosures, NAP represents that its Variable rate plan is based upon the wholesale market rate.  Indeed, that is the entire hook by which NAP attracts consumers to Variable rate plans.

23.     For example, NAP directs its sales representatives to explain the relative benefits of Variable and Fixed rate plans as follows:

> A variable rate is subject to change with market pricing, which means when market prices go down, so does the variable rate. . . .   A fixed rate means that the price per unit remains steady for a specific period of time, regardless of market price fluctuations.  The benefit of that is that you are protected in the event market prices rise. . . .   *A variable rate is subject to change with market pricing, which means when market prices go down, so does the variable rate.  **That enables you to take advantage of market lows, which isn't necessarily the case when you're locked into a fixed-rate.***

("Frequently Asked Questions" Chart filed by NAP in PURA Docket No. 13-07-18, Document OCC-22, on March 21, 2014, at pp. 46-47) (emphasis added).

24.     NAP confirms that its rates are market-based in follow-up confirmatory phone calls.  In the script that NAP uses for that confirmatory phone call, NAP requires variable rate consumers to confirm their understanding that "you will be paying a month-to-month, ***market-based*** variable rate that can fluctuate from time to time."  (Script filed by NAP in PURA Docket No. 13-07-18, Document No. OCC-36, on March 21, 2014.)  Similarly, NAP's marketing materials routinely represent that the company's Variable rate is "market based" (Advertising Material filed by NAP in PURA Docket No. 13-07-18 on April 7, 2014, at pp. 4, 14).

25.     Most importantly, NAP's Variable rate "Terms of Service" also make this express link between the Variable rate charged by the company and the underlying wholesale market rates from ISO New England charged by Generation Companies, stating "[t]he variable rate may increase or decrease to reflect the changes in the wholesale power market." (Contracts filed by NAP in PURA Docket No. 09-10-21 and in Docket No. 13-07-18, Document No. OCC-37, on March 21, 2014, at p. 1.)

26.     Accordingly, a reasonable consumer would understand that NAP's Variable rates fluctuate in a manner correlated with the underlying wholesale market rate, and that, although prices would go up when wholesale prices rose, they would also go down when wholesale prices decreased, enabling consumers to take advantage of market lows.

27.     Instead, and contrary to reasonable consumer expectation, NAP used its Variable rates as a pure profit center, increasing the rates charged to class members when wholesale prices rose, but staying at a level as much as *double, triple or quadruple* the wholesale market rates when the wholesale prices fell.

28.     For example, the chart below sets forth (1) the average wholesale price (in dollars per kilowatt hour) of electricity delivered to Connecticut for each month during the period from October 2013 through October 2014, as reported by ISO New England; (2) the non-promotional variable rates NAP charged to consumers in Connecticut for those same months; and (3) the resulting percentage premium that NAP charged consumers over the wholesale rate on an average per-month basis:

7

| | OCT - 13 | NOV- 13 | DEC- 13 | JAN- 13 | FEB- 14 | MAR- 14 | APR- 14 | MAY- 14 | JUN- 14 | JUL- 14 | AUG- 14 | SEPT- 14 | OCT- 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Average Wholesale | $0.0345 | $0.0447 | $0.0880 | $0.1664 | $0.1539 | $0.1092 | $0.045 | $0.0373 | $0.0381 | $0.0379 | $0.0305 | $0.0345 | $0.0329 |
| NAP | $0.0999 | $0.1099 | $0.1299 | $0.1799 | $0.1999 | $0.1999 | $0.1699 | $0.1799 | $0.1799 | $0.1599 | $0.1649 | $0.1649 | $0.1749 |
| NAP Premium *ABOVE* Wholesale Price | **189%** | **146%** | **48%** | **8%** | **30%** | **83%** | **278%** | **383%** | **372%** | **322%** | **441%** | **378%** | **432%** |

29.     The extreme divergence between the wholesale price paid by NAP and the retail

price it charged its Connecticut customers during the period from October 2013 through October

2014 is likewise illustrated on the following graph (and, for purposes of comparison, the Standard

Service Rate charged by CL&P during the same period):



30.     Accordingly, NAP routinely charges class members a Variable electric rate that is as much as four times higher than the underlying market rate.[1]  Additionally, upon information and belief, NAP's non-promotional variable rates haven't matched, much less beat, the standard offer fixed rates in over two years.

31.     Moreover, NAP's essential representation to consumers concerning its Variable pricing plan – that "when market prices go down, so does the variable rate," that the Variable rate is "market-based," and that "[t]he variable rate may increase or decrease to reflect the changes in the wholesale power market" – is patently false.  Although NAP *increases* its Variable rate in response to *rising* wholesale prices (as illustrated in the period from October 2013 through January 2014 above), and in fact raised its Connecticut prices three times in a *single week* to account for rising wholesale prices in January of 2014, NAP fails to *decrease* its prices in response to a *falling* wholesale market price.  For example, from January to March, 2014, the wholesale price dropped 34 percent, while NAP's price actually *rose* by 11 percent.  The same pattern is clear in the periods from April to May, 2014, July to August, 2014, and September to October, 2014.  Even when NAP's price moved downward, it did not decline *nearly* as far or as fast as the wholesale price.  For example, from March to April, 2014, the wholesale price declined by 59 percent, from 10.92 cents to 4.5 cents per kilowatt hour, while NAP's price declined a mere 15 percent, from 19.99

---

[1]  The NAP rates reflected in the above chart and graph reflect NAP's lowest-cost Variable rate, which includes "25% Renewable" energy.  Connecticut presently only requires that electricity be derived from 18% renewable sources.  However, upon information and belief, the increased cost to NAP for providing 25% (rather than 18%) renewable energy is negligible.  For example, CL&P offers a "Sterling Energy" *100%* renewable energy plan for only *$0.01* more than its Standard rate.  NAP itself offers a *100%* renewable energy plan with rates approximately $0.02 more than under its 25% renewable energy plan rates.  Accordingly, the fact that NAP's basic Variable Rate plan offers 25% renewably-sourced electricity does not explain the tremendous discrepancy of as much as 14 or 15 cents between that rate and contemporaneous wholesale electric rates.

cents to a still-astronomical 16.99 cents per kilowatt hour.  As a result, NAP routinely priced its services at two, three, and even *four* times the price it paid to the companies that actually generated the power.  At one point, NAP's price premium was an incredible *441 percent* above the wholesale price.

32.      Notably, NAP charges these exorbitant premiums without adding any value to the consumer whatsoever.  As detailed above, NAP does not either produce or transport electricity.  It has no role in running or maintaining power plants or power lines; it does no hook-ups or emergency response.  Indeed, NAP does not even handle customer billing: that, too, is handled by the Distribution Company.  Essentially, all that NAP does is act as a trader in the transaction.  Yet it charges several multiples of the amount the Generation Companies receive for making electricity and the Distribution Companies receive for transmitting power, maintaining power lines, and handling emergency services and customer billing and calls.[2]

**C.      Plaintiff Paul Edwards Suffered Injury Due To NAP's Improper Business Practices**

33.      Plaintiff Paul Edwards has been on NAP's Variable rate plan since at least August 2013.

34.      Plaintiff reasonably relied on NAP's false statements that NAP's Variable rate was based on the underlying wholesale market rate.

35.      Plaintiff paid NAP's exorbitant Variable electricity rates and thereby suffered monetary damages as a result of NAP's conduct as set forth above.

---

[2] For example, CL&P currently charges 6.4 cents per kilowatt hour plus a flat charge of $16 for distribution services, while NAP's price for its services is 17.5 cents per kilowatt hour.  According to the U.S. Energy Information Administration, the average household in Connecticut uses 731 kilowatt hours per month. http://www.eia.gov/tools/faqs/faq.cfm?id=97&t=3.  Such an average household will pay CL&P about $63 this month for distribution services, while paying NAP $128 – twice as much.

## CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil

Procedure behalf of himself and the following class of similarly situated persons:

> All persons enrolled in a North American Power & Gas, LLC, variable rate electric
> plan in connection with a property located within Connecticut, Rhode Island, New
> Hampshire and Maine at any time within the applicable statutes of limitations
> preceding the filing of this action through and including the date of class
> certification (the "Class").

37.     Plaintiff reserves the right to modify or amend the definition of the proposed Class

or to propose sub-classes as might be necessary or appropriate.

38.     Excluded from the Class are Defendant, including any parent, subsidiary, affiliate

or person controlled by Defendant; Defendant's officers, directors, agents or employees; the

judicial officers assigned to this litigation; and members of their staffs and immediate families.

39.     The proposed Class and meets all requirements for class certification.  The Class

satisfies the numerosity standard.  The Class is believed to number in the tens of thousands of

persons as NAP has over 50,000 residential customers in Connecticut alone according to

information the company filed in PURA docket 13-07-18.  As a result, joinder of all class members

in a single action is impracticable.  On information and belief, class members can be identified by

NAP and Distribution Company records.

40.     There are questions of fact and law common to the Class which predominate over

any questions affecting only individual members.  The questions of law and fact common to the

Class arising from NAP's actions include, without limitation, whether NAP:

> a.  Committed unfair or deceptive trade practices by its Variable electric rate
>     policies and practices;

b. breached its covenant of good faith and fair dealing with regard to its Variable electric rate contracts;

c. was unjustly enriched through its Variable electric rate policies and practices; and

d. continues to commit wrongdoing through its Variable electric rate policies and practices.

41.     The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness and equity to other available methods for the fair and efficient adjudication of this controversy.

42.     Plaintiff is an adequate representative of the Class because he is a member of the Class and his interests do not conflict with the interests of the members of the class he seeks to represent.  The interests of the members of the Class will be fairly and adequately protected by Plaintiff and his undersigned counsel, who have extensive experience prosecuting complex class action litigation.

43.     Plaintiff's claims are typical of the claims of the Class because they arise out of the same conduct, policies, and practices of NAP with respect to its Variable electric rate policies and practices.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other putative class member.

44.     Maintenance of this action as a class action is a fair and efficient method for the adjudication of this controversy.  It would be impracticable and undesirable for each class member who suffered harm to bring a separate action.  In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent

adjudications, while a single class action can determine, with judicial economy, the rights of all class members.

45.     Notice can be provided to Class members by using techniques and forms of notice similar to those customarily used in other class actions.

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATION OF STATE UNFAIR TRADE PRACTICES ACTS,

46.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

47.     Plaintiff brings this count individually and as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the Class.

48.     NAP is engaged in "trade" and "commerce" as it offers electricity for sale to consumers.

49.     NAP's conduct as alleged above constitutes unfair practices:

a.   NAP's contracts do not accurately describe the rates the customer will be paying or the circumstances under which the rates may change.

b.   NAP's acts and practices with regard to its exorbitant Variable electric rates as alleged above are immoral, unethical, oppressive and unscrupulous.

c.   NAP's conduct is substantially injurious to consumers.   Such conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have paid such a high price for electricity but for NAP's immoral, unethical, oppressive and unscrupulous practices and procedures. Consumers have thus overpaid for their electricity and such injury is not

13

outweighed by any countervailing benefits to consumers or competition.   No benefit to consumers or competition results from NAP's conduct, nor could consumers reasonably have avoided the injury.

50.     NAP's conduct as alleged above also constitutes a deceptive act or practice.   NAP's Variable electric rate representations as set forth above were and are likely to mislead consumers and NAP intended that consumers rely upon those representations.   Plaintiff and other reasonable consumers reasonably interpreted Defendant's representations to mean that NAP's Variable rates track the underlying wholesale power rates (when in fact they do not).   NAP's representations were material to a reasonable consumer and likely to affect consumer decisions and conduct, including purchases of power from NAP pursuant to Variable rate contracts.

51.     The foregoing unfair and deceptive practices directly, foreseeably and proximately caused Plaintiff and the Class to suffer an ascertainable loss and substantial injury when they paid an exorbitant premium for electricity over wholesale market rates.

52.     The foregoing actions constitute unfair and deceptive practices in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.,* the Maine Unfair Trade Practices Act, Me. Rev. Stat. tit. 5, § 205-A *et seq.,* the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:1 *et seq.,* and the Rhode Island Unfair Trade Practices and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1 *et seq.*

53.     Plaintiff and the Class are entitled to recover damages and other appropriate relief, as alleged below.

## COUNT II

### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

54.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

55.     All contracts contain an implied covenant of good faith and fair dealing, including Plaintiff's and Class members' contracts with NAP.

56.     NAP's Terms of Service with customers gives NAP discretion concerning the monthly rates charged under Variable rate contracts and any "increase[s] or decrease[s]" to the rate "to reflect the changes in the wholesale power market."

57.     As alleged herein, NAP has used its discretion to bill exorbitant rates that are not tied to the wholesale market and to *increase* the monthly Variable rate when wholesale markets rise, but not to commensurately *decrease* the monthly Variable rate when wholesale markets fall. As a result, consumers are billed exorbitant electric rates several multiples of the wholesale market rate.

58.     NAP's performance of its discretionary functions under the Terms of Service as alleged herein to maximize its revenue from Variable electric rates impedes the right of Plaintiff and other Class Members to receive benefits that they reasonably expected to receive under the contract.

59.     On information and belief, NAP's actions as alleged herein were performed in bad faith, in that the purpose behind the practices and policies alleged herein was to maximize NAP's revenue at the expense of its customers and in contravention of their reasonable expectations as customers of NAP.

60.     NAP has breached the covenant of good faith and fair dealing in the Terms of Service through its Variable electric rate policies and practices as alleged herein.

61.     Plaintiff and members of the putative Class have sustained damages as a result of NAP's breaches as alleged herein.

## COUNT III

## UNJUST ENRICHMENT

62.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

63.     NAP has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein to the detriment of Plaintiff and the Class.

64.     NAP has been enriched by a benefit in the form of payment of exorbitant Variable electric rates.

65.     NAP's enrichment was at the expense of Plaintiff and the Class.

66.     It would be unjust to allow NAP to retain the benefit.

67.     Plaintiff and the Class are entitled to disgorgement and restitution of all wrongfully-obtained gains received by NAP as a result of its wrongful conduct alleged herein.

68.     Plaintiff and members of the Class have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the putative Class, requests that this Court enter judgment against Defendant and in favor of Plaintiff and award the following relief:

(a)     Certification of the proposed Class;

(b)     Injunctive relief enjoining NAP from charging exorbitant Variable electric rates under their current policies and from engaging in the wrongful, deceptive, unfair, and unconscionable practices alleged herein;

(c)     Damages in an amount to be determined at trial, including actual and punitive damages;

(d)     Disgorgement and restitution of all exorbitant rates paid to NAP by Plaintiff and the putative Class as a result of the wrongs alleged herein;

(f)     Pre- and post- judgment interest at the maximum rate permitted by applicable law;

(g)     Attorneys' fees, costs, and expenses as available under the law.

(h)     Such other and additional relief as the Court may find just and equitable.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all causes of action so triable.

DATED:  November 18, 2014

PLAINTIFF

By: Robert A. Izard (ct01601)
Seth R. Klein (ct18121)
Nicole A. Veno (ct29373)
IZARD NOBEL LLP
29 South Main Street, Suite 305
West Hartford, CT  06107
(860) 493-6292