## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| PAUL T. EDWARDS, GERRY WENDROVSKY, JOHN ARCARO, SANDRA DESROSIERS and LINDA SOFFRON, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NORTH AMERICAN POWER AND: GAS, LLC, <br><br> Defendant. | **No. 3:14-cv-01714** <br><br><br> **[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT** |

1.      Plaintiffs, Paul T. Edwards, Gerry Wendrovsky, John Arcaro, Sandra Desrosiers and Linda Soffron ("Plaintiffs"), on behalf of themselves and all persons similarly situated, by and through their attorneys, allege as follows.

### INTRODUCTION

2.      Plaintiffs bring this action on behalf of themselves and a Class (and Subclasses) of all similarly situated customers in Connecticut, Rhode Island and New Hampshire against Defendant North American Power and Gas, LLC ("NAP"), arising out of NAP's unfair, deceptive, unconscionable and bad faith billing for "supplying" electricity to consumers.

3.      NAP entices customers to sign up for its service by offering low initial rates for electricity.  When the "teaser rate" period expires, however, customers are rolled over into a month-to-month variable rate plan with exorbitant rates.

4.    NAP represents in its marketing materials and in its contracts that it offers a "variable rate" electricity plan to consumers that is tied to the market rate in the wholesale power market.   However, contrary to NAP's representations and obligations, NAP consistently and improperly charges an extraordinarily high premium rate for electricity *regardless* of fluctuations in the underlying market price. Indeed, as set forth below, NAP routinely charges its consumers *three to four times* the underlying market rate, notwithstanding NAP's representations that its variable rates "reflect" monthly wholesale electric prices and will be a "market based" rate.

5.    Specifically, NAP's rates go *up* to match spikes in the underlying market price. However, when the market price goes *down*, NAP's rate remains at an inflated level several times higher than the market rate. This policy allows NAP to capture all the benefit of changing market prices for electricity, while placing all the risk on its customers.   NAP is able to avoid any diminution in its profits when market rates for electricity go up by passing along the increases, while reaping all the benefit when electricity rates decline.

6.    This unfair and deceptive scheme of charging inflated electric prices that match *increases* in the underlying market price while failing to pass-along *decreases* is intentionally designed to maximize revenue for NAP.

7.    Plaintiffs and other NAP customers have been injured by NAP's unlawful practices. Accordingly, Plaintiffs, on behalf of themselves and the Class (including the Connecticut, Rhode Island and New Hampshire Subclasses as defined below), seek damages, restitution and injunctive relief for NAP's violation of the Connecticut, Rhode Island and New Hampshire state unfair trade practices acts (Counts I, II and III respectively), breach of express contract (Count IV), and, in the alternative to Count IV, breach of the covenant of good faith and fair dealing (Count V).

## PARTIES

8.      Plaintiff Paul T. Edwards is a citizen of the State of Connecticut.  His domicile is in Connecticut because resides in New Britain, Connecticut where he has his home, and it is his intent to continue living in Connecticut.

9.      Plaintiff Gerry Wendrovsky is a citizen of the State of New York.  His domicile is in New York because he resides in New York City where he has his home, and it is his intent to continue living in New York.  Mr. Wendrovsky also owns property in North Canaan, Connecticut.

10.     Plaintiff John Arcaro is a citizen of the State of Rhode Island.  His domicile is in Rhode Island because resides in Pawtucket, Rhode Island where he has his home, and it is his intent to continue living in Rhode Island.

11.     Plaintiff Sandra Desrosiers is a citizen of the New Hampshire.  Her domicile is in New Hampshire because she resides in Nashua, New Hampshire where she has her home, and it is her intent to continue living in New Hampshire.

12.     Plaintiff Linda Soffron is a citizen of the New Hampshire.  Her domicile is in New Hampshire because she resides in Portsmouth, New Hampshire where she has her home, and it is her intent to continue living in New Hampshire.

13.     Defendant North American Power and Gas, LLC is a limited liability company organized under the laws of Delaware whose principal place of business is located at 20 Glover Avenue, Norwalk, CT 06851.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this civil action under 28 U.S.C. § 1332(d) because this is a class action filed under Rule 23 of the Federal Rules of Civil Procedure, the amount in

controversy exceeds $5,000,000 and there are members of the Class who are citizens of a different state than Defendant NAP.

15.     This Court has personal jurisdiction over NAP because NAP maintains its headquarters in Connecticut and because NAP has tens of thousands of customers in Connecticut and thereby conducts business in this state.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because NAP resides in Norwalk, Connecticut.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

**A.     Energy Deregulation and the Role of Electric Suppliers**

17.     In the late 90s and early 2000s, many states moved to deregulate at least part of the electricity supply services then performed by large public utilities.  Delivery of electricity to a consumer requires both the creation of electricity and the transmission of that electricity from the power plant to the consumer. The typical pattern was to require the public utilities to divest their power generation assets such as coal, gas and nuclear power plants.  But, the regulated utilities continued distributing power from these power plants to consumers through transmission lines.

18.     When deregulation occurred, the business of power *supply* was opened to competition and consumers were allowed to select the companies from whom they would purchase their power.  However, states generally set a "standard offer," available to all customers in each public utility's service area.  The standard offer is typically a single, flat rate which is fixed for a period of months.

19.     As a result of the deregulation of power supply, several different parties are now involved in the supply of electric power to consumers.  Certain companies, such as Dominion, produce electric power ("Generation Companies"). Other companies, such as Eversource Energy

(formerly CL&P) and United Illuminating in Connecticut, National Grid in Rhode Island and Eversource Energy (formerly PSNH) in New Hampshire, distribute electricity from Generation Companies to the end user ("Distribution Companies"). Although some Generation Companies have sold power directly to consumers, most sell the power they generate on the wholesale market to companies that market to retail customers ("Electric Suppliers").

20.     The market for wholesale power in the New England States is under the administration of an independent, not-for-profit corporation formed in accordance with the recommendations of the Federal Energy Regulatory Commission, called ISO New England (for "Independent System Operator"). ISO New England coordinates and directs the generation and flow of electricity throughout the region, ensuring that electric supply exactly meets demand throughout the network. The wholesale market managed by ISO New England determines where and when electricity will be made by Generation Companies and the wholesale prices that will be paid for that electricity through competitive bids. "More than 500 companies participate in these markets, buying and selling between $6-$14 billion of electric power and related products annually." http://www.iso-ne.com/about/what-we-do/three-roles/administering-markets. The bid process determines the Generation Company that will make each unit of electricity and the wholesale price each Energy Supplier will pay to each Generator for each unit of energy delivered to specific locations throughout the region.

21.     Electric Suppliers play a middleman role: they purchase power directly or indirectly from Generation Companies and sell that electricity to end-user consumers. However, Electric Suppliers do not **_deliver_** that electricity to consumers. Rather, Generation Companies deliver the electricity to Distribution Companies, which in turn deliver the electricity to the ultimate consumer. Electric Suppliers merely buy electricity at the wholesale rate and then sell

that power to end-users with a mark-up. Thus, Electric Suppliers are essentially brokers and traders: they neither make nor deliver electricity, but merely buy electricity from the Generation Companies and re-sell it to end users.

22.    Like other Electric Suppliers, NAP purchases power on the wholesale market and sells it to consumers. The rates that NAP charges are not approved by states' regulatory authorities such as Connecticut's Public Utility Regulatory Authority ("PURA") or the Public Utilities Commissions ("PUC") of Rhode Island or New Hampshire. Rather, NAP and other Suppliers are free to set their own rates for supplying electricity to consumers. And NAP, like all other suppliers, relies upon the Distribution Companies to deliver the electricity it purchases on the wholesale market to its customers. The Distribution Companies charge separately for their distribution-related services, using rates that are reviewed and approved by the states' regulatory agencies.

23.    Electric Suppliers may contract with consumers to supply electricity on either a "Fixed" or "Variable" rate basis. Under a Fixed contract, the Supplier agrees to supply electricity at a set rate for a certain number of months.

24.    Under a Variable rate contract, the Supplier may vary the rate it charges on a periodic basis (often monthly).

**B.    North American Power's Excessive Rates**

25.    NAP has offered various Fixed and Variable rate plans, including contracts that charge a low promotional "teaser" rate which is fixed for a set number of months before automatically rolling into a Variable rate plan.

26.    Throughout its contracts, marketing materials and required disclosures, NAP represents that its Variable rate plan is based upon the wholesale market rate. Indeed, that is the entire hook by which NAP attracts consumers to Variable rate plans.

27.    For example, NAP directs its sales representatives to explain the relative benefits of Variable and Fixed rate plans as follows:

> A variable rate is subject to change with market pricing, which means when market prices go down, so does the variable rate. . . . A fixed rate means that the price per unit remains steady for a specific period of time, regardless of market price fluctuations.  The benefit of that is that you are protected in the event market prices rise. . . . *A variable rate is subject to change with market pricing, which means when market prices go down, so does the variable rate.* ***That enables you to take advantage of market lows, which isn't necessarily the case when you're locked into a fixed-rate.***

("Frequently Asked Questions" Chart filed by NAP in PURA Docket No. 13-07-18, Document OCC-22, on March 21, 2014, at pp. 46-47) (emphasis added).

28.    NAP confirms that its rates are market-based in follow-up confirmatory phone calls.  In the script that NAP uses for that confirmatory phone call, NAP requires variable rate consumers to confirm their understanding that "you will be paying a month-to-month, ***market-based*** variable rate that can fluctuate from time to time."  (Script filed by NAP in PURA Docket No. 13-07-18, Document No. OCC-36, on March 21, 2014.)  Similarly, NAP's marketing materials routinely represent that the company's Variable rate is "market based" (Advertising Material filed by NAP in PURA Docket No. 13-07-18 on April 7, 2014, at pp. 4, 14).

29.    Most importantly, NAP's Variable rate "Terms of Service" in Connecticut, Rhode Island and New Hampshire also make this express link between the Variable rate charged by the company and the underlying wholesale market rates from ISO New England, stating "[t]he variable rate may increase or decrease to reflect the changes in the wholesale power market." (Contracts filed by NAP in PURA Docket No. 09-10-21 and in Docket No. 13-07-18, Document No. OCC-37, on March 21, 2014, at p. 1; Rhode Island Customer Terms of Service form RI-TOS-GSE-121613-EN). Other contracts in these states similarly state that the variable rate will be a "variable market based rate" (NH-TOS-F).

7

30.     Connecticut law requires electric suppliers to specify in their contracts "the circumstances under which . . . rates may change." Conn. Gen. Stat. §16-245o(f)(2). Similarly, the Rhode Island PUC's "Consumer Protection Requirements for Nonregulated Power Producers" provides (at paragraphs II.D and E) that electric supply contracts "must be written in plain English" and that "[p]rice information should include *pricing elements, price change formulas*, and the potential for price volatility through variable rates or other mechanisms" (emphasis added). The New Hampshire Code of Administrative Rules likewise states that each electric supplier disclose in its terms of service "[a]ll fixed and variable prices of the service being offered to the consumer, including an explanation of any variable prices and the circumstances that would cause the price to vary." NH ADC PUC 2004.02(b)(2).

31.     Accordingly, a reasonable consumer would understand that NAP's Variable rates fluctuate in a manner correlated with the underlying wholesale market rate, and that, although prices would go up when wholesale prices rose, they would also go down when wholesale prices decreased, enabling consumers to take advantage of market lows.

32.     Instead, and contrary to reasonable consumer expectation, NAP used its Variable rates as a pure profit center, increasing the rates charged to class members when wholesale prices rose, but staying at a level as much as *double, triple or quadruple* the wholesale market rates when the wholesale prices fell.

33.     For example, the chart below sets forth (1) the average wholesale price (in dollars per kilowatt hour) of electricity delivered to Connecticut for each month during the period from October 2013 through April of 2015, as reported by ISO New England;[1] (2) the non-promotional

---

[1] This is the "Total Wholesale Rate" paid by Suppliers, including not only the wholesale price of power but also all of ISO-New England's charges, such as its charges for capacity, Net Commitment Period Compensation (NCPC), Ancillary Markets, and Wholesale Market Services,

variable rates NAP charged to consumers in Connecticut for those same months; and (3) the resulting percentage premium that NAP charged consumers over the wholesale rate on an average per-month basis:

| Month | Total Wholesale Rate for Connecticut (cents/kilowatt hour) | NAP Price (cents/kilowatt hour) | NAP's Spread (cents/kilowatt hour) | NAP's Price as Percentage of Wholesale Rate |
|---|---|---|---|---|
| October 2013 | 4.221 | 9.99 | 5.769 | 237% |
| November 2013 | 5.344 | 10.99 | 6.344 | 206% |
| December 2014 | 10.588 | 12.99 | 2.402 | 123% |
| January 2014 | 18.615 | 17.99 | -0.625 | 97% |
| February 2014 | 15.803 | 19.99 | 4.187 | 127% |
| March 2014 | 12.312 | 19.99 | 7.678 | 162% |
| April 2014 | 4.689 | 16.99 | 12.301 | 362% |
| May 2014 | 4.192 | 17.99 | 13.798 | 429% |
| June 2014 | 4.538 | 17.99 | 13.452 | 396% |
| July 2014 | 4.182 | 15.99 | 11.808 | 382% |
| August 2014 | 3.755 | 16.49 | 12.735 | 439% |
| September 2014 | 4.632 | 16.49 | 11.858 | 356% |
| October 2014 | 3.748 | 17.49 | 13.742 | 467% |
| November 2014 | 5.140 | 17.49 | 12.35 | 340% |
| December 2014 | 5.199 | 19.99 | 14.791 | 384% |
| January 2015 | 7.382 | 19.99 | 12.608 | 270% |
| February 2015 | 13.443 | 17.99 | 4.547 | 134% |
| March 2015 | 6.669 | 16.99 | 10.321 | 255% |
| April 2015 | 3.431 | 13.99 | 10.559 | 408% |

as reported in ISO New England's monthly Wholesale Load Cost Reports.

34.     The extreme divergence between the wholesale price paid by NAP and the retail price it charged its Connecticut customers during the same period is likewise illustrated on the following graph (which, for purposes of comparison, also shows the Standard Service Rate charged by Eversource Energy/CLP during the same period.[2]



35.     Connecticut, uniquely, requires electricity suppliers to post their highest and lowest variable rates on their websites, but the more limited publicly-available data for Rhode Island and New Hampshire show that NAP engaged in the same practices in both states.  During the period from October of 2013 to April of 2015, for example, the ISO New England Total Wholesale Rates for Rhode Island and New Hampshire were virtually the same as the Rates in Connecticut,

---

[2]  The NAP rates reflected in the above chart and in the graph reflect NAP's lowest-cost Variable rate, which includes "25% Renewable" energy.  Connecticut presently only requires that electricity be derived from 18% renewable sources.  However, upon information and belief, the increased cost to NAP for providing 25% (rather than 18%) renewable energy is negligible.  For example, Eversource Energy offers a "Sterling Energy" *100%* renewable energy plan for only *$0.01* more than its Standard rate.  NAP itself offers a *100%* renewable energy plan with rates approximately  $0.02 more than its 25% renewable energy plan rates.   Accordingly,  the fact that NAP's basic Variable Rate plan offers 25% renewably-sourced electricity does not explain the tremendous discrepancy of as much as 14 or 15 cents between that rate and contemporaneous wholesale electric rates.

generally only a couple percentage points different. Meanwhile, the rates that NAP charged to its Rhode Island and New Hampshire customers were as exorbitant as they were in Connecticut, and moved in tandem with Connecticut rates. For example, the rates that that NAP charged Plaintiffs Derosier and Soffron in New Hampshire jumped from 8.6 cents per kilowatt hour in September of 2013 to 13.99 cents per kilowatt hour in December of 2013, increasing NAP's margin over the ISO Wholesale Rates from 4.55 cents per kilowatt hour to 6.13 cents, and in February of 2014, when wholesale rates began to decline following the worst of the polar vortex, Derosier's NAP rate stayed at 18.99 cents per kilowatt hour (Soffron had switched to a different rate plan by that point). Similarly, Plaintiff Arcaro's NAP rate in Rhode Island in late 2014 followed the same pattern as its Connecticut rates. For example, while the wholesale rate declined from 4.364 cents per kilowatt hour in September of 2014 to 3.642 cents per kilowatt hour in October of 2014, NAP's price jumped from 15.41 cents per kilowatt hour to 15.94 cents, increasing NAP's spread from an already sky-high 11.04 cents to 12.3 cents per kilowatt hour.

36.     Accordingly, NAP routinely charges class members a Variable electric rate that is as much as four times higher than the underlying market rate, and has increased its margin over wholesale rates. Additionally, upon information and belief, NAP's non-promotional variable rates haven't matched, much less beat, the standard offer fixed rates in over two years.

37.     Moreover, NAP's essential representation to consumers concerning its Variable pricing plan – that "when market prices go down, so does the variable rate," that the Variable rate is "market-based," and that "[t]he variable rate may increase or decrease to reflect the changes in the wholesale power market" – is patently false. Although NAP *increases* its Variable rate in response to *rising* wholesale prices (as illustrated in the period from October 2013 through January 2014 above), and in fact raised its Connecticut prices three times in a *single week* to account for

rising wholesale prices in January of 2014, NAP fails to *decrease* its prices in response to a *falling* wholesale market price. For example, from January to March, 2014, the wholesale price dropped 34 percent, while NAP's price in Connecticut actually *rose* by 11 percent. The same pattern is clear in the periods from April to May, 2014, July to August, 2014, and September to October, 2014. Even when NAP's price moved downward, it did not decline *nearly* as far or as fast as the wholesale price. For example, from March to April, 2014, the wholesale price declined by 62 percent, from 12.312 cents to 4.689 cents per kilowatt hour, while NAP's price declined a mere 15 percent, from 19.99 cents to a still-astronomical 16.99 cents per kilowatt hour. As a result, NAP routinely priced its services at two, three, and even *four* times the price it paid to the companies that actually generated the power. At one point, NAP's price premium was an incredible *467 percent* of the wholesale price.

38.     Notably, NAP charges these exorbitant premiums without adding any value to the consumer whatsoever. As detailed above, NAP does not either produce or transport electricity. It has no role in running or maintaining power plants or power lines; it does no hook-ups or emergency response. Indeed, NAP does not even handle customer billing: that, too, is handled by the Distribution Company. Essentially, all that NAP does is act as a trader in the transaction. Yet it charges several multiples of the amount the Generation Companies receive for making electricity and the Distribution Companies receive for transmitting power, maintaining power lines, and handling emergency services and customer billing and calls.[3]

---

[3] For example, in October of 2014 Eversource in Connecticut charged 6.4 cents per kilowatt hour plus a flat charge of $16 for all of its distribution services, while NAP's price for its services was 17.5 cents per kilowatt hour. According to the U.S. Energy Information Administration, the average household in Connecticut uses 731 kilowatt hours per month. http://www.eia.gov/tools/faqs/faq.cfm?id=97&t=3. Such an average household would have paid Eversource about $63 that month for all of its distribution services, while paying NAP $128 – twice as much – for doing absolutely nothing that added value to the consumer.

39.     Moreover, NAP's costs, other than its wholesale cost of power, were relatively fixed and could not have justified the massive increases and variations alleged above. For example, charges for ancillary and capacity charges and other regulatory costs did not fluctuate to any material extent and, in particular, did not fluctuate to a material extent in relation to wholesale power prices. NAP's other material costs were for operations, and included costs, for example, relating to rent, equipment, overhead, employees, etc. were also relatively fixed and could not justify the price variations alleged above.

40.     Accordingly, NAP's essential representation to consumers concerning its Variable pricing plan – that the Variable rate is based on market conditions – is patently false.

41.     Based on the foregoing, Defendant's Terms and Conditions fail to disclose the pricing factors and determinants as required by applicable state law as alleged above.

C.     **Plaintiffs Suffered Injury Due To NAP's Improper Business Practices**

42.     Plaintiff Edwards was on NAP's Variable rate plan from at least November 2013 to October of 2014. His rates during that period ranged from 15.99-17.99 cents per kilowatt hour.

43.     Plaintiff Edwards reasonably relied on NAP's false statements that NAP's Variable rate was based on the underlying wholesale market rate.

44.     Plaintiff Edwards paid NAP's exorbitant Variable electricity rates alleged above and thereby suffered monetary damages as a result of NAP's conduct as set forth above.

45.     After paying a low teaser rate, Plaintiff Wendrovsky was been on NAP's Variable rate plan beginning in July, 2014. From late July, 2014 – March, 2015, his rate varied between 12.629 – 19.99 cents per kilowatt hour.

46.     Plaintiff Wendrovsky reasonably relied on NAP's false statements that NAP's Variable rate was based on the underlying wholesale market rate.

47.     Plaintiff Wendrovsky paid NAP's exorbitant Variable electricity rates alleged above and thereby suffered monetary damages as a result of NAP's conduct as set forth above.

48.     Plaintiff Arcaro was on NAP's Variable rate plan from at least January 2014 to November, 2015.  His rates during that period ranged from 8.44 (the teaser rate) to 17.48 cents per kilowatt hour.

49.     Plaintiff Arcaro reasonably relied on NAP's false statements that NAP's Variable rate was based on the underlying wholesale market rate.

50.     Plaintiff Arcaro paid NAP's exorbitant Variable electricity rates alleged above and thereby suffered monetary damages as a result of NAP's conduct as set forth above.

51.     Plaintiff Desrosiers was on NAP's Variable rate plan from September of 2013 until February of 2014.  During that period, her rates increased from 8.5 cents per kilowatt hour to 18.99 cents per kilowatt hour.

52.     Plaintiff Desrosiers reasonably relied on NAP's false statements that NAP's Variable rate was based on the underlying wholesale market rate.

53.     Plaintiff Desrosiers paid NAP's exorbitant Variable electricity rates alleged above and thereby suffered monetary damages as a result of NAP's conduct as set forth above.

54.     Plaintiff Soffron was on NAP's Variable rate plan from September of 2013 until January of 2014.  During that period, her rates increased from 7.3 cents per kilowatt hour to over 14 cents per kilowatt hour, at which point Plaintiff Soffron switched to another rate plan.

55.     Plaintiff Soffron reasonably relied on NAP's false statements that NAP's Variable rate was based on the underlying wholesale market rate.

56.     Plaintiff Soffron paid NAP's exorbitant Variable electricity rates alleged above and thereby suffered monetary damages as a result of NAP's conduct as set forth above.

57.     Plaintiffs suffered an ascertainable loss in that they paid more than they should have for power. Defendant's acts as alleged above were a reasonably foreseeable result of and a substantial factor in causing that loss.

## CLASS ACTION ALLEGATIONS

58.     Plaintiffs Edwards, Wendrovsky, Arcaro Desrosiers and Soffron bring this class action on behalf of themselves and following class of similarly situated North American customers:

> All persons enrolled in a North American Power & Gas, LLC, variable rate electric plan in connection with a property located within Connecticut, Rhode Island and/or New Hampshire at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of class certification (the "Class").

59.     Plaintiffs Edwards and Wendrovsky additionally bring this class action on behalf of themselves and the following subclass of similarly situated owners of Connecticut property:

> All persons enrolled in a North American Power & Gas, LLC, variable rate electric plan in connection with a property located within Connecticut at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of class certification (the "Connecticut Subclass").

60.     Plaintiff Arcaro additionally brings this class action on behalf of himself and the following class of similarly situated owners of Rhode Island property:

> All persons enrolled in a North American Power & Gas, LLC, variable rate electric plan in connection with a property located within Rhode Island at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of class certification (the "Rhode Island Subclass").

61.     Plaintiffs Desrosiers and Soffron additionally bring this class action on behalf of themselves and the following subclass of similarly situated owners of New Hampshire property:

> All persons enrolled in a North American Power & Gas, LLC, variable rate electric plan in connection with a property located within New Hampshire

at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of class certification (the "New Hampshire Subclass").

62.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class and Subclasses or to propose additional subclasses as might be necessary or appropriate.

63.     Excluded from the Class and Subclasses are Defendant, including any parent, subsidiary, affiliate or person controlled by Defendant; Defendant's officers, directors, agents or employees; the judicial officers assigned to this litigation; and members of their staffs and immediate families.

64.     The proposed Class and Subclasses meet all requirements for class certification. The Class and Subclasses satisfy the numerosity standard.  NAP has over 50,000 customers in Connecticut alone according to information the company filed in PURA docket 13-07-18.  On information and belief, North American similarly has, at a minimum, thousands of customers in Rhode Island and New Hampshire.  As a result, joinder of all class members in a single action is impracticable.  On information and belief, class and subclass members can be identified by NAP and Distribution Company records.

65.     There are questions of fact and law common to the Class and Subclasses which predominate over any questions affecting only individual members.  The questions of law and fact common to the Class and Subclasses arising from NAP's actions include, without limitation, whether NAP:

    a.  Committed unfair or deceptive trade practices by its Variable electric rate policies and practices;

    b.  breached its contract with regard to its Variable electric rate contracts;

    c.  breached its covenant of good faith and fair dealing with regard to its Variable electric rate contracts;

d. was unjustly enriched through its Variable electric rate policies and practices; and

e. continues to commit wrongdoing through its Variable electric rate policies and practices.

66. The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness and equity to other available methods for the fair and efficient adjudication of this controversy.

67. Plaintiffs are adequate representatives of the Class and their respective Subclasses because they are members of the Class and respective Subclasses and their interests do not conflict with the interests of the members of the class they seek to represent. The interests of the members of the Class and Subclasses will be fairly and adequately protected by Plaintiffs and their undersigned counsel, who have extensive experience prosecuting complex class action litigation.

68. Plaintiffs' claims are typical of the claims of the Class and their respective Subclasses because they arise out of the same conduct, policies, and practices of NAP with respect to its Variable electric rate policies and practices. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other putative class member.

69. Maintenance of this action as a class action is a fair and efficient method for the adjudication of this controversy. It would be impracticable and undesirable for each class member who suffered harm to bring a separate action. In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all class members.

70. Notice can be provided to Class and Subclass members by using techniques and forms of notice similar to those customarily used in other class actions.

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT

### (by Plaintiffs Edwards and Wendrovsky on behalf of the Connecticut Subclass)

71.     Plaintiffs Edwards and Wendrovsky repeat and reallege the preceding paragraphs as though set forth herein.

72.     Plaintiffs Edwards and Wendrovsky bring this count individually and as a class action on behalf of themselves and the Connecticut Subclass.

73.     NAP is engaged in "trade" and "commerce" as it offers electricity for sale to consumers.

74.     NAP's conduct as alleged above constitutes unfair practices:

   a.   NAP's contracts do not accurately describe the rates the customer will be paying or the circumstances under which the rates may change.

   b.   NAP's acts and practices with regard to its exorbitant Variable electric rates as alleged above are immoral, unethical, oppressive and unscrupulous.

   c.   NAP's conduct is substantially injurious to consumers.  Such conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have paid such a high price for electricity but for NAP's immoral, unethical, oppressive and unscrupulous practices and procedures. Consumers have thus overpaid for their electricity and such injury is not outweighed by any countervailing benefits to consumers or competition.  No benefit to consumers or competition results from NAP's conduct, nor could consumers reasonably have avoided the injury.

75.     NAP's conduct as alleged above also constitutes a deceptive act or practice.  NAP's Variable electric rate representations as set forth above were and are likely to mislead consumers and NAP intended that consumers rely upon those representations.  Plaintiffs and other consumers reasonably interpreted Defendant's representations to mean that NAP's Variable rates track the underlying wholesale power rates (when in fact they do not).  NAP's representations were material to a reasonable consumer and likely to affect consumer decisions and conduct, including purchases of power from NAP pursuant to Variable rate contracts.

76.     The foregoing unfair and deceptive practices directly, foreseeably and proximately caused Plaintiffs Edwards and Wendrovsky and the Connecticut Subclass to suffer an ascertainable loss and substantial injury when they paid an exorbitant premium for electricity over wholesale market rates.

77.     The foregoing actions constitute unfair and deceptive practices in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq.*

78.     Plaintiffs and the Connecticut Subclass are entitled to recover damages and other appropriate relief, as alleged below.

## COUNT II

## VIOLATION OF RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT

### (by Plaintiff Arcaro on behalf of the Rhode Island Subclass)

79.     Plaintiff Arcaro repeats and realleges the preceding paragraphs as though set forth herein.

80.     Plaintiff Arcaro brings this count individually and as a class action on behalf of himself and the Rhode Island Subclass.

81.     NAP is engaged in "trade" and "commerce" as it offers electricity for sale to consumers.

82.     NAP's conduct as alleged above constitutes unfair practices:

    a.  NAP's contracts do not accurately describe the rates the customer will be paying or the circumstances under which the rates may change.

    b.  NAP's acts and practices with regard to its exorbitant Variable electric rates as alleged above are immoral, unethical, oppressive and unscrupulous.

    c.  NAP's conduct is substantially injurious to consumers.  Such conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have paid such a high price for electricity but for NAP's immoral, unethical, oppressive and unscrupulous practices and procedures. Consumers have thus overpaid for their electricity and such injury is not outweighed by any countervailing benefits to consumers or competition.  No benefit to consumers or competition results from NAP's conduct, nor could consumers reasonably have avoided the injury.

83.     NAP's conduct as alleged above also constitutes a deceptive act or practice.  NAP's Variable electric rate representations as set forth above were and are likely to mislead consumers and NAP intended that consumers rely upon those representations.  Plaintiffs and other consumers reasonably interpreted Defendant's representations to mean that NAP's Variable rates track the underlying wholesale power rates (when in fact they do not).  NAP's representations were material to a reasonable consumer and likely to affect consumer decisions and conduct, including purchases of power from NAP pursuant to Variable rate contracts.

84.     The foregoing unfair and deceptive practices directly, foreseeably and proximately caused Plaintiff Arcaro and the Rhode Island Subclass to suffer an ascertainable loss and substantial injury when they paid an exorbitant premium for electricity over wholesale market rates.

85.     The foregoing actions constitute unfair and deceptive practices in violation of the Rhode Island Unfair Trade Practices and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1 *et seq.*

86.     Plaintiff Arcaro and the Rhode Island subclass are entitled to recover damages and other appropriate relief, as alleged below.

## COUNT III

## VIOLATION OF NEW HAMPSHIRE CONSUMER PROTECTION ACT

### (by Plaintiffs Desrosiers and Soffron on behalf of the New Hampshire Subclass)

87.     Plaintiffs Desrosiers and Soffron repeat and reallege the preceding paragraphs as though set forth herein.

88.     Plaintiffs Desrosiers and Soffron bring this count individually and as a class action on behalf of themselves and the New Hampshire Subclass.

89.     NAP is engaged in "trade" and "commerce" as it offers electricity for sale to consumers.

90.     NAP's conduct as alleged above constitutes unfair practices:

    a.  NAP's contracts do not accurately describe the rates the customer will be paying or the circumstances under which the rates may change.

    b.  NAP's acts and practices with regard to its exorbitant Variable electric rates as alleged above are immoral, unethical, oppressive, rascalous and unscrupulous.

c.   NAP's conduct is substantially injurious to consumers.   Such conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have paid such a high price for electricity but for NAP's immoral, unethical, oppressive and unscrupulous practices and procedures. Consumers have thus overpaid for their electricity and such injury is not outweighed by any countervailing benefits to consumers or competition.   No benefit to consumers or competition results from NAP's conduct, nor could consumers reasonably have avoided the injury.

91.   NAP's conduct as alleged above also constitutes a deceptive act or practice.  NAP's Variable electric rate representations as set forth above were and are likely to mislead consumers and NAP intended that consumers rely upon those representations.  Plaintiffs and other consumers reasonably interpreted Defendant's representations to mean that NAP's Variable rates track the underlying wholesale power rates (when in fact they do not).  NAP's representations were material to a reasonable consumer and likely to affect consumer decisions and conduct, including purchases of power from NAP pursuant to Variable rate contracts.

92.   The foregoing unfair and deceptive practices directly, foreseeably and proximately caused Plaintiffs Desrosiers and Soffron and the New Hampshire Subclass to suffer an ascertainable loss and substantial injury when they paid an exorbitant premium for electricity over wholesale market rates.

93.   The foregoing actions constitute unfair and deceptive practices in violation of the New Hampshire Consumer Protections Act, N.H. Rev. Stat. Ann. § 358-A:1 *et seq.*

94.   Plaintiffs Desrosiers and Soffron and the New Hampsshire subclass are entitled to recover damages and other appropriate relief, as alleged below.

## COUNT IV

## EXPRESS BREACH OF CONTRACT

### (by all Plaintiffs on behalf of the Class)

95.     Plaintiffs repeat and reallege the preceding paragraphs as though set forth herein.

96.     NAP's Terms of Service with customers expressly state that any "increase[s] or decrease[s]" to NAP's Variable rates would "reflect the changes in the wholesale power market" and be a "market based rate."

97.     As alleged herein, NAP's variable rates in fact bore *no relationship* to the wholesale price for power.  While NAP's variable rates went up when the wholesale rate went up, NAP's rates did not commensurately *decrease* when wholesale markets fell – to the contrary, NAP's rates sometimes even went *up* even as wholesale rates were declining.  As a result, NAP breached its contracts with customers as consumers were billed exorbitant electric rates several multiples of the wholesale market rate.

98.     Plaintiffs and members of the Class have sustained damages as a result of NAP's breach of contract as alleged herein.

## COUNT V

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### (in the alternative to Count IV, by all Plaintiffs on behalf of the Class)

99.     Plaintiffs repeat and reallege the preceding paragraphs as though set forth herein.

100.     All contracts contain an implied covenant of good faith and fair dealing, including Plaintiffs and all other Class members' contracts with NAP.

101.     To the extent that NAP's Terms of Service with customers can be read to give NAP *discretion* concerning the monthly rates charged under Variable rate contracts (discretion that was,

nonetheless, constrained by the requirement that its exercise would "reflect the changes in the wholesale power market," NAP failed to exercise that discretion in a manner that was consistent with the covenant of good faith and fair dealing.

102.    As alleged herein, NAP has used its discretion to bill exorbitant rates that are not tied to the wholesale market and to *increase* the monthly Variable rate when wholesale markets rise, but not to commensurately *decrease* the monthly Variable rate when wholesale markets fall. As a result, consumers are billed exorbitant electric rates several multiples of the wholesale market rate.

103.    NAP's performance of its discretionary functions under the Terms of Service as alleged herein to maximize its revenue from Variable electric rates impedes the right of Plaintiffs and Class members to receive benefits that they reasonably expected to receive under the contract.

104.    On information and belief, NAP's actions as alleged herein were performed in bad faith, in that the purpose behind the practices and policies alleged herein was to maximize NAP's revenue at the expense of its customers and in contravention of their reasonable expectations as customers of NAP.

105.    NAP has breached the covenant of good faith and fair dealing in the Terms of Service through its Variable electric rate policies and practices as alleged herein.

106.    Plaintiffs and members of the Class have sustained damages as a result of NAP's breaches as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the putative Classes, request that this Court enter judgment against Defendant and in favor of Plaintiffs and award the following relief:

        (a)     Certification of the proposed Classes;

        (b)     Injunctive relief enjoining NAP from charging exorbitant Variable electric rates under their current policies and from engaging in the wrongful, deceptive, unfair, and unconscionable practices alleged herein;

        (c)     Damages in an amount to be determined at trial, including actual, multiple, statutory and punitive damages;

        (d)     Disgorgement and restitution of all exorbitant rates paid to NAP by Plaintiffs and members of the Classes as a result of the wrongs alleged herein;

        (f)     Pre- and post- judgment interest at the maximum rate permitted by applicable law;

        (g)     Attorneys' fees, costs, and expenses as available under the law.

        (h)     Such other and additional relief as the Court may find just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action so triable.

DATED:  May 18, 2016

PLAINTIFFS

   /s/ Robert A. Izard
By: Robert A. Izard (ct01601)
    Seth R. Klein (ct18121)
    IZARD NOBEL LLP
    29 South Main Street, Suite 305
    West Hartford, CT  06107
    (860) 493-6292

    Nicholas D. Wright, Esq. (*pro hac* forthcoming)
    Bouchard, Kleinman & Wright, P.A.
    799 Mammoth Road
    Manchester, NH 03104
    Tel:  603-623-7222
    Fax:  603-623-8953