# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| PAUL T. EDWARDS, GERRY WENDROVSKY, SANDRA DESROSIERS and LINDA SOFFRON, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NORTH AMERICAN POWER & GAS, LLC,<br><br>Defendant. | Case No:  3:14-cv-1714 (VAB)<br><br><br><br><br>June 11, 2018 |

### DECLARATION OF ROBERT A. IZARD IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, CERTIFICATION OF SETTLEMENT CLASS, AND APPROVAL OF AWARD OF ATTORNEYS' FEES AND EXPENSES AND PLAINTIFF SERVICE AWARDS

I, Robert A. Izard, hereby declare as follows:

1.      I am a partner at the law firm of Izard Kindall & Raabe LLP ("IKR") and am competent to declare the matters stated herein.

2.      My firm represents plaintiffs Paul Edwards, Gerry Wendrovsky, Sandra Desrosiers, Linda Soffron in this putative class action lawsuit against North American Power & Gas, LLC ("NAPG" or "Defendant"), as well as John Arcaro in the related *Arcaro v. North American Power & Gas, LLC*, No. 3:16-cv-01921 (D. Conn) litigation.  I submit this declaration in support of Plaintiffs' unopposed motion for approval of class action settlement and related relief.

### *History of the Litigation*

3.      Before bringing the *Edwards* and *Arcaro* actions, this firm exhaustively investigated Plaintiffs' claims and independently obtained copies of the relevant contractual terms and conditions, as well as samples of Defendant's marketing materials.  Plaintiffs' counsel also identified and investigated the relevant energy markets.

4.      Plaintiff Paul Edwards filed a class action complaint against NAPG on November 18, 2014, styled as *Edwards v. NAPG,* No. 3:14-cv-01714 (the "*Edwards* Action"), in the United States District Court for the District of Connecticut. On August 4, 2015, this Court denied NAPG's motion to dismiss as to all of the Mr. Edwards' substantive claims except unjust enrichment (which was dismissed without prejudice).  The court also held that Mr. Edwards did not have standing to represent consumers from states other than his home state of Connecticut.  Accordingly, Mr. Edwards filed an amended complaint, adding plaintiffs Gerry Wendrovsky, Sandra Desrosiers, and Linda Soffron (the latter two of whom are residents of New Hampshire) on June 3, 2016, on behalf of Connecticut and New Hampshire consumers   The parties then proceeded with discovery, including the production and review of hundreds of thousands of documents, service of expert reports, depositions of each of the named plaintiffs, and a 30(b)(6) corporate deposition of Defendant.   The *Edwards* plaintiffs filed their motion for class certification on May 24, 2017 (ECF Nos. 82-87), which was fully briefed and awaiting oral argument at the time of settlement.  NAPG also filed a motion for summary judgment on November 11, 2017 (ECF No. 105); filing of the *Edwards* plaintiffs' opposition has been stayed pending settlement.

5.      Plaintiff John Arcaro filed a class action complaint against NAPG on October 31, 2016 styled as *Arcaro v. North American Power & Gas, LLC, No. 3:16-cv-01921-WWE*

(the "Arcaro Action"), in this Court on behalf of Rhode Island consumers.  Insofar as the preexisting *Fritz* and *Tully* actions (discussed below), pending before Judge Eginton, already covered Rhode Island consumers, Arcaro and NAPG agreed that the *Arcaro* action should be transferred to Judge Eginton.  Once before Judge Eginton, the parties moved to stay *Arcaro* pending the outcome of the *Fritz* and *Tully* actions, which the Court (Eginton, J.) granted.  That stay remains in place.

6.      As part of their investigations, and in preparation for their class certification motions and for a trial on the merits, Plaintiffs engaged the services of Seabron Adamson, a Vice President and electric-industry economist and specialist with the Energy practice at Charles River Associates.  Mr. Adamson provided his expertise with respect to the manner in which NAPG determined its rates, and assisted Plaintiffs in determining the extent to which NAPG's rates violated its contracts and in calculating potential damages measures.

7.      On March 20, 2017, the parties in the *Edwards* action conducted a full-day mediation session with Peter Woodin of JAMS.  Although no settlement was reached, the parties to *Edwards* continued to discuss settlement directly.

8.      On June 27, 2017, the parties in the *Fritz* Actions and in the related *Claridge* litigation reached a settlement in principle with NAPG.  The Parties in the *Fritz* and *Tully* Actions and *Claridge* filed a motion for preliminary approval of the Settlement on August 4, 2017 before Judge Castel in the Southern District of New York (where *Claridge* was and is pending).  The *Edwards* Plaintiffs opposed preliminary approval before Judge Castel, and wrote a letter seeking permission to move to intervene and raising certain concerns about the plan of allocation and, in addition, their belief that it was improper for the *Fritz, Tully* and *Claridge* Plaintiffs to include in

their settlement the states at issue in the *Edwards* Actions.  Judge Castel thereafter denied the *Fritz, Tully* and *Claridge* plaintiffs' motion for preliminary approval.

9.     Thereafter, the Parties in the Actions agreed to submit to mediation jointly.  On September 25, 2017, the Parties in the Actions participated in a full-day mediation session with Mr. Woodin.  The Parties could not reach a settlement during that session.  Nevertheless, the Parties agreed to participate in another full-day mediation session with Hon. Diane M. Welsh, U.S.M.J. (Ret.), which resulted in the Parties reaching a settlement in principle.  The formal Settlement Agreement was entered into on January 16, 2018.

10.    In accord with the Preliminary Approval Order, the Parties worked with Heffler Claims Group ("Heffler") to provide the class with information about the case and the proposed settlement.

11.    Based upon a spreadsheet provided by Heffler concerning the 16,890 claims that have been fully processed and approved as of June 8, 2018, the average claimant will receive approximately $50.  Approximately 4,700 of the 16,890 processed claims are receiving between $2 and $9.99, which is itself a nontrivial sum.  Approximately 4,500 are receiving between $10 and $29.99; approximately 2,300 are receiving between $30 and $49.99; and another 2,900 are receiving between $50 and $99.99.  Approximately 2,400 Class Members are receiving over $100, and approximately 200 of those are receiving over $300.

12.    Plaintiffs Edwards, Wendrovsly, Desrosiers, Soffron and Arcaro have actively prosecuted this case.  Each cooperated with counsel in finalizing and/or reviewing the various complaints filed during the history of this action and kept informed about the case as the litigation progressed.  Plaintiffs Edwards, Wendrovsky, Desrosiers, and Soffron responded to Defendant's interrogatories and documents requests and had their depositions taken.  Plaintiff

Edwards also attended one of the mediation sessions with Defendant.  Each Plaintiff also approved the final settlement terms and recommend that counsel accept it and submit it to the Court for approval.  Each spent many hours of his or her own time working with counsel on the case.  Without their active participation, the lawsuit could not have been prosecuted at all.

### IKR's Time, Lodestar and Expenses

13.     Seth Klein and I were the attorneys primarily involved in the day-to-day management and oversight of this litigation, although other firm attorneys were involved in its successful prosecution and resolution.  The firm's experience, as well those of the attorneys most closely involved in the litigation, are described in detail in the IKR Firm Resume attached as Exhibit A.

14.     As of June 8, 2018, IKR attorneys and staff have spent 1,525.25 hours prosecuting this case, including time devoted to investigating, drafting pleadings, engaging in discovery and motion practice, reviewing documents, conducting and defending depositions, retaining and consulting experts, negotiating and finally settling this case.  IKR's aggregate lodestar is $1,170,468.75, broken down as follows:

| Attorney | Rate | Hours | Lodestar |
|---|---|---|---|
| Robert A. Izard | 925 | 458.25 | 423,881.25 |
| Mark P. Kindall | 850 | 76.50 | 65,025.00 |
| Craig A. Raabe | 850 | 103.50 | 87,975.00 |
| Seth R. Klein | 750 | 727.50 | 545,625.00 |
| Nicole A. Veno | 350 | 2.25 | 787.50 |
| Jennifer Decoteau Somers (contract attorney) | 300 | 157.25 | 47,175.00 |
| **Total** | | **1,525.25** | **$1,170,468.75** |

15.     The schedule shown in the preceding paragraph was prepared from contemporaneous daily time records regularly prepared and maintained by IKR, which are available at the request of the Court.

16.     The hourly rates shown in paragraph 13 are the same as the regular current rates charged for services in non-contingent hourly rate billing matters.  In addition, numerous courts throughout the country and in this state have accepted IKR's rates as the basis for lodestar calculations in other class actions in which we have served as counsel.

17.     IKR has incurred a total of $332,304.80 in unreimbursed expenses in connection with the prosecution of this case as of June 8, 2018.  The vast majority of IKR's expenses involved payments to experts, without whose analysis this case could not have been prosecuted. IKR's unreimbursed expenses are broken down as follows:

| Category | Amount |
|---|---|
| Copies | 8.10 |
| Court Fees | 400.00 |
| Expert/Investigator Fees | 312,557.50 |
| Mediation/Arbitration | 8,424.25 |
| Research/Discovery | 4,644.52 |
| Sheriff/Service Fees | 174.90 |
| Transcripts | 3,699.67 |
| Travel | 2,106.91 |
| Postage/Delivery | 246.39 |
| Sales Tax | 42.56 |
| **Total** | **$332,304.80** |

18.     The expenses shown in the preceding paragraph were actually incurred and paid over the course of the litigation.  They were all paid by IKR, with no guarantee that they would ever be recovered except in the event that the litigation was successful and the Court approved the reimbursement.  I have reviewed these expenses and believe that they were both necessary and appropriate for the prosecution of the case.

### *Additional Exhibit*

19.     A true and correct copy of the transcript of the final approval hearing in *In re HIKO ENERGY LLC, Energy Litigation*, No. 14 Civ. 1771 (VB) ("*In re HIKO*") (S.D.N.Y.) dated May 9, 2016, is attached hereto as Exhibit B.


I declare under penalty of perjury that the foregoing is true and correct.


DATED: June 11, 2018                                  _____
                                                                              Robert A. Izard

# Exhibit A



# FIRM RESUME

Izard, Kindall & Raabe LLP ("IKR")[1] is one of the premier firms engaged in class action litigation on behalf of consumers, investors and employees.  In the consumer area, the Firm has served or is serving as lead counsel in cases involving a variety of industries including banking, *Mathena v. Webster Bank, N.A.,* Civil Action No. 3:10-cv-01448-SRU (D. Conn), *Farb v. Peoples United Bank,* UWY-CV11-6009779-S (Conn Sup. Ct); *Forgione v. Webster Bank, N.A.,* No. X10-UWY-CV-12-6015956-S (Conn. Sup. Ct.); wholesale milk pricing, *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.,* No. 02-cv-0377 (D. Conn.); book printing and distribution, *Booklocker.com, Inc. v. Amazon.com*, 08-cv-00160-JAW (D. Me); gasoline distribution, *Wyatt Energy v. Motiva Enterprises, LLC,* X01 cv 02-0174090-S (Conn. Super Ct); and electricity supply contracts, *Richards v. Direct Energy Services, LLC,* No. 3:14-cv-01724 (D. Conn.), *Chandler v. Discount Power,* No. X03-HHD-CV14-6055537 (Conn. Super. Ct.), *Edwards v. North American Power & Gas, LLC,* No. 3:14-cv-1714 (D. Conn.), *Gruber v. Starion Energy, Inc.,* No. 3:14-cv-01828 (D. Conn.), *Jurich v. Verde Energy, USA, Inc.,* No. HHD-cv-156060160 (Conn. Super. Ct.), *Sanborn v. Viridian Energy, Inc.,* No. 3:14-cv-01731 (D. Conn.), and *Steketee v. Viridian Energy, Inc.,* No. 3:15-cv-00585.

---

[1] Formerly known as Izard Nobel LLP, Schatz Nobel Izard, P.C., and Schatz & Nobel, P.C.

IKR is also representing consumers of ramen noodles in an antitrust action (*In re Korean Ramen Antitrust Litig.,* No. C-13-04115 (N.D. Cal.), and purchasers of a variety of consumer products in unfair trade practice cases, including *Langan v. Johnson & Johnson Consumer Companies, Inc.,* Nos. 13-cv-01470 & 13-cv-01471 (D. Conn.), *Fagan v. Neutrogena Corp.,* No. EDCV 13-01316 (C.D. Cal.), *Morales v. Conopco Inc., d/b/a Unilever,* No. 2:13-cv-2213 (ED Cal.), and *Balser v. The Hain Celestial Group, Inc.,* No. 13-cv-5604 (C.D. Cal.).

The Firm's successful consumer practice is informed by our lawyers' work prior to joining IKR.  Robert Izard represented an insurer in price-fixing litigation in various state courts and one federal court around the United States, while Seth Klein worked for the consumer protection department of the Connecticut Attorney General's Office.  Our practice is also built upon the Firm's decades of experience in class action litigation where we have frequently served as lead or co-lead counsel, including:

) *Papanikolaou v. Value-Added Communications*, No. 3-95CV0346-H (N.D. Tex.);

) *Gorga v. Uniroyal Chemical Corp.,* No. CV-96-0132014-S (Conn. Super.);

) *David v. Simware, Inc.,* No. 96/602143 (N.Y. Sup.);

) *Butler v. Northstar Health Services, Inc.,* No. 96-701 (W.D. Pa.);

) *Allen v. Johansson,* No. 397CV02172 (RNC) (D. Conn.);

) *Feiner v. SS&C Techs.,* No. 397CV0656 (D. Conn.);

) *Berti v. Videolan Techs, Inc,* No.3:97CV296H (W.D. Ky.);

) *Ganino v. Citizens Utilities Co.,* No. 398CV00480 (JBA) (D. Conn.);

) *Bunting v. HealthCor Holdings, Inc.,* No. 398CV0744-D (N.D. Tex.);

) *Hirsch v. PSS World Medical, Inc.,* No. 98 502 Civ. J20A (M.D. Fla.);

) *Kenneth Blau v. Douglas Murphy,* No. H 99 0535 (S.D. Tex.);

) *Angres v. Smallworldwide plc,* No. 99-K-1254 (D. Colo.);

) *In re Complete Mgmt., Inc. Sec. Litig.,* No. 99 Civ. 1454 (S.D.N.Y.);

) *Allain Roy v. dELiA's, Inc.,* No. 99 Civ. 3951 (JES) (S.D.N.Y.);

) *Russo v. KTI, Inc.,* No. 99-1780 (JAG) (D.N.J.);

) *Laborers Local 1298 Pension Fund v. Campbell Soup Co.,* No. 00-152 (JEI) (D.N.J.);

) *Hart v. Intern, thet Wire,* No. 00 Civ. 6571 (S.D.N.Y.);

) *Ottmann v. Hanger Orthopedic Group, Inc.,* No. AW 00CV3508 (D. Md.);

) *In re PolyMedica Corp. Sec. Litig.,* No. 00-12426-REK (D. Mass.);

) *Karl L. Kapps v. Torch Offshore, Inc.,* No. 02-CV-0582 (E.D. La);

) *In re Cable and Wireless, PLC, Sec. Litig.,* No. 02-1860 (E.D. Va);

) *In re Alloy, Inc. Sec. Litig.,* Case No. 03-CV-1597 (S.D.N.Y.);

) *In re Surebeam Corporation Sec. Litig.,* No. 03-CV-1721 (S.D. Cal.);

) *In re Primus Telecoms. Group, Inc. Sec. Litig.,* Master Case No. 04-970-A (E.D. Va.);

) *In re Netopia Sec. Litig.,* Case No. C 04-3364 (N.D. Cal);

) *Malasky v. IAC/InterActive Corp.,* Case No. 04-CV-7447 (S.D.N.Y.);

) *In re Supportsoft, Inc. Sec. Litig.,* No. C 04-5222 SI (N.D. Cal.);

) *Berson v. Applied Signal Tech. Inc.,* No. 4:05-cv-01027-SBA (N.D. Cal.);

) *The Cornelia I. Crowell GST Trust v. Pemstar, Inc.,* No. 05-CV-1182 (D. MN);

) *UFCW Local 880 Retail Food Employers Joint Pension Fund v. Newmont Mining Corp.,* No. 05-CV-01046 (D. Colo.);

) *Aviva Partners v. Exide Techs.,* No. 3:05-CV-03098 (D. NJ);

) *In re Veritas Software Corp. Sec. Litig.,* No. 04-831 (D. Del.);

⟩ *In re Ionatron, Inc. Sec. Litig.,* No. 06-354 (D. AZ);

⟩ *In re FX Energy, Inc. Sec. Litig.,* No. 2:07-CV-00874 (D. UT);

⟩ *In re First Virtual Communications, Inc. Sec. Litig.,* No. C-04-3585MJJ (N.D. Cal.);

⟩ *Melms v. Home Solutions of America,* No. 3:07-CV-1961-N (N.D. Tex.);

⟩ *In re: McDermott Int'l, Inc. Sec. Litig.,* No. 1:08-cv-09943-DC (S.D.N.Y 2008);

⟩ *Desai v. Bucksbaum,* No. 09-CV-487 (N.D. IL.);

⟩ *Bauer v. Prudential, Inc.,* No. 09-cv-1120 (JLL) (D.NJ); and

⟩ *Klugmann v. American Capital Ltd.,* No. 09-CV-0005 (D. Md.).

⟩ *Overby v. Tyco Int'l, Ltd.,* No. 02-CV-1357-B (D.N.H.);

⟩ *In re Reliant Energy ERISA Litig.,* No. H-02-2051 (S.D. Tex.);

⟩ *In re AOL Time Warner, Inc. Sec. and ERISA Litig.,* MDL Docket No. 1500 (S.D.N.Y.);

⟩ *Furstenau v. AT&T,* Case No. 02 CV 8853 (D.N.J.);

⟩ *In re AEP ERISA Litig.,* Case No. C2-03-67 (S.D. Ohio);

⟩ *In re JDS Uniphase Corp. ERISA Litig.,* Civil Action No. 03-4743-CW (N.D. Cal.);

⟩ *In re Sprint Corporation ERISA Litig.,* Master File No. 2:03-CV-02202-JWL (D. Kan.);

⟩ *In re Cardinal Health, Inc. ERISA Litig.,* Case No. C 2-04-642 (S.D. Ohio);

⟩ *Spear v. Hartford Fin. Svcs Group. Inc.,* No. 04-1790 (D. Conn.);

⟩ *In re Merck & Co., Inc. Sec., Derivative and ERISA Litig.,* MDL No. 1658 (D.N.J.);

⟩ *In re Diebold ERISA Litig.* No. 5:06-CV- 0170 (N.D. Ohio);

⟩ *In re Bausch & Lomb, Inc. ERISA Litig.,* Master File No. 06-CV-6297-MAT-MWP (W.D.N.Y.);

⟩ *In re Dell, Inc. ERISA Litig.,* Case No. 06-CA-758-SS (W.D. Tex.);

) *In re First American Corp. ERISA Litig.,* SA-CV07-1357 (C.D. Cal.);

) *In re Hartford Fin. Svcs Group. Inc. ERISA Litig.,* No. 08-1708 (D. Conn.);

) *In re Merck & Co., Inc. Vytorin ERISA Litig.*, MDL No. 1938, 05-CV-1974 (D.N.J.);

) *Mayer v. Administrative Committee of Smurfit Stone Container Corp.*, 09-CV-2984 (N.D. IL.);

) *In re YRC Worldwide ERISA Litig.,* Case No. 09-CV-02593 (D. Kan);

) *Board of Trustees v. JP Morgan Chase Bank*, Case No. 09-cv-9333 (S.D.N.Y.);

) *White v. Marshall & Ilsley Corp.*, No. 10-CV-00311 (E.D. Wis.);

) *Griffin v. Flagstar Bancorp, Inc.*, No. 2:10-CV-10610 (E.D. Mich.);

) *In re Eastman Kodak ERISA Litig.*, Master File No. 6:12-cv-06051-DGL (W.D.N.Y.);

) *Kemp-DeLisser v. Saint Francis Hospital and Medical Center*, Civil Action No. 3:15-cv-01113-VAB;

) *Tucker v. Baptist Health System, Inc.*, Case No. 2:15-cv-00382-SLB (N.D.AL.);

) *Malone v. TIAA*, No. 1:15-cv-8038 (PKC)(S.D.N.Y.);

) *Wood v. Prudential Retirement Insurance and Annuity Company*, No. 3:15-cv-1785 (VLB) (D.Conn.);

) *Lau v. Metropolitan Life Insurance Company*, No. 1:15-cv-9469 (SAS) (S.D.N.Y.);

) *Bishop-Bristol v. Massachusetts Mutual Life Insurance Company*, No. 3:16-cv-139(SRU) (D. Conn.);

) *Matthews v. Reliance Trust Company*, No. 1:16-cv-04773 (N.D. Ill.);

) *In re Disney ERISA Litig.,* Master File No. 2:16-CV-2251-PA (JCx) (C.D. Cal.);

) *Brace v. Methodist Le Bonheur Healthcare,* No. 16-cv-2412-SHL-tmp (W.D. Tenn.);

⟩ *Nicholson v. Franciscan Missionaries of our Lady Health Systems,* No. 16-CV-258-SDD-EWD (M.D. LA);

⟩ *In re Mercy Health ERISA Litig.,* No. a:16-cv-441 (S.D. Ohio); and

⟩ *Negron v. Cigna Corp.,* No. 3:16-cv-01702 (D. Conn.).

Our notable successes include settlements against Saint Francis Hospital & Medical Center ($107 million), AOL Time Warner ($100 million); Tyco International ($70.5 million); Merck ($49.5 million); Cardinal Health ($40 million); and AT&T ($29 million). Moreover, IKR was on the Executive Committee in *In re Enron Corporation Securities and ERISA Litig.*, No. 02-13624 (S.D. Tex.), which resulted in a recovery in excess of $250 million.

IKR's successful prosecution of class actions has been recognized and commended by judges in numerous judicial districts.  In the *Tyco ERISA* litigation, Judge Barbadoro commented:

> I have absolutely no doubt here that the settlement is fair, reasonable and adequate.  I think, frankly, it's an extraordinary settlement given the circumstances of the case and the knowledge that I have about the risks that the plaintiff class faced in pursuing this matter to verdict . . . . [I]t was a very, very hard fight and they made you work for everything you obtained on behalf of the Class here....

> I have a high regard for you. I know you to be a highly experienced ERISA class action lawyer. You've represented your clients aggressively, appropriately and effectively in this litigation, and I have a high degree of confidence in you so I don't think there's any question that the quality of counsel here is a factor that favor's the Court's endorsement of the proposed settlement. . . .

> I have enjoyed working with you in this case. You've always been helpful. You've been a gentleman. You've been patient when I've been working on other matters. .

*In re Tyco Int'l Ltd. Sec. Litig.*, Case No. 02-1335 (D.N.H. Nov. 18, 2009). Similarly, in approving the Sprint ERISA settlement, Judge Lungstrum found, "[t]he high quality of [IKR's] work culminated in the successful resolution of this complex case" and that "the results obtained by virtue of the settlement are extraordinary. . . ." *In re Sprint Corp. ERISA Litig.*, No. 03-2202 (D. Kan. Aug. 3, 2006).  A Special Master appointed in the AOL Time Warner ERISA case commented that obtaining an additional $30 million for the class stood out as "some of the hardest work and most outstanding results" obtained by IKR and its co-counsel.  *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, No. 02-CV-1500 (S.D.N.Y), Report & Recommendation of Special Master dated August 7, 2007.  The District Court's decision approving the settlement negotiated by IKR in the St. Francis litigation similarly found the result to be "an extremely favorable one for the class," noting that the recovery achieved by the settlement represented over 76 percent of the amount by which the retirement plan was alleged to be underfunded.  *Kemp-DeLisser v. Saint Francis Hosp. & Med. Ctr.,* No. 15-CV-1113 (VAB), 2016 WL 6542707, at *10 (D. Conn. Nov. 3, 2016).  The Court also noted that IKR's time and efforts "resulted in an extremely efficient and favorable resolution of the case." *Id.* at *5.

## ATTORNEYS

**Robert A. Izard** heads the firm's ERISA team and is lead or co-lead counsel in many of the nation's most significant ERISA class actions, including cases against Merck, Tyco International, Time Warner, AT&T and Sprint among others.  Mr. Izard has substantial experience in other types of complex class action and commercial

litigation matters.   For example, he represented a class of milk purchasers in a price fixing case.   He also represented a large gasoline terminal in a gasoline distribution monopolization lawsuit.

As part of his twenty plus years litigating complex commercial cases, Mr. Izard has substantial jury and nonjury trial experience, including a seven-month jury trial in federal district court.       He is also experienced in various forms of alternative dispute resolution, including mediation and arbitration, and is a Distinguished Neutral for the CPR Institute for Dispute Resolution.

Mr. Izard is the author of Lawyers and Lawsuits: A Guide to Litigation published by Simon and Schuster and a contributing author to the Mediation Practice Guide.   He is the former chair of the Commercial and Business Litigation Committee of the Litigation Section of the American Bar Association.

Mr. Izard received his B.A. from Yale University and his J.D., with honors, from Emory University, where he was elected to the Order of the Coif and was an editor of the Emory Law Journal.

**Mark P. Kindall** joined the firm in 2005.   Since joining the firm, he has represented clients in many significant class action cases, including ERISA litigation against AOL Time Warner, Kodak and Cardinal Health, consumer fraud cases against Johnson & Johnson, Unilever and Neutrogena, securities fraud litigation against SupportSoft, American Capital and Nuvelo, and bank overdraft fee litigation against Webster Bank and People's United Bank. Mr. Kindall successfully argued the 2008 appeal of *Berson v. Applied Signal Tech. Inc.*, 527 F.3d 982 (9th Cir. 2008), and the 2015 appeal of *Balser v. The Hain Celestial Group,* No. 14–55074,

2016 WL 696507 (9th Cir. 2016), which clarified standards for victims of securities and consumer fraud, respectively.

Mr. Kindall was a lawyer at Covington & Burling in Washington, D.C. from 1988 until 1990. In 1990 he joined the United States Environmental Protection Agency as an Attorney Advisor. He represented the U.S. government in international negotiations at the United Nations, the Organization for Economic Cooperation and Development and the predecessor of the World Trade Organization, and was a member of the U.S. Delegation to the United Nations Conference on Environment and Development (the "Earth Summit") in Rio de Janeiro in 1992. From 1994 until 2005, Mr. Kindall was an Assistant Attorney General for the State of Connecticut, serving as lead counsel in numerous cases in federal and state court and arguing appeals before the Connecticut Supreme Court and the United States Court of Appeals for the Second Circuit.

Mr. Kindall has taught courses in appellate advocacy, administrative law and international environmental law at the University of Connecticut School of Law. He is admitted to practice in Connecticut, California, and the District of Columbia. He is also a member of the bar of the United States Supreme Court, the U.S. Courts of Appeals for the Second, Ninth, and D.C. Circuits, and the United States District Courts for Connecticut, the District of Columbia, the Eastern District of Wisconsin, the Central District of Illinois, and all District Courts in New York and California.

Mr. Kindall is a 1988 graduate of Boalt Hall School of Law at the University of California at Berkeley, where he served as Book Review Editor of the California Law Review and was elected to the Order of the Coif. He has a bachelor's degree in

history with highest honors from the University of California at Riverside, and he also studied history at the University of St. Andrews in Scotland.

**Craig A. Raabe** joined the partnership in 2016 from a large, regional law firm, where he previously served as the chair of the litigation department. Mr. Raabe has tried many complex civil and criminal cases. He is a Fellow in the American College of Trial Lawyers. He has been listed in The Best Lawyers in America© in the areas of Commercial Litigation and Criminal Defense since 2006 (Copyright 2014 by Woodward/White, Inc., Aiken, SC). Mr. Raabe's commercial trial experience is broad and includes areas such as antitrust, government contracting, fraud, intellectual property, and unfair trade practices. He also has tried many serious felony criminal cases in state and federal court and is active in the criminal defense trial bar. In addition to his trial practice, Mr. Raabe counsels clients on compliance issues and the resolution of regulatory enforcement actions by government agencies.

By appointment of the chief judge of the Second Circuit, Mr. Raabe has served on the Reappointment Committee for Connecticut's federal defender, and the chief judge of the Connecticut district court appointed him to chair the United States Magistrate Reappointment Committee in Connecticut. In 2012, the Connecticut district court judges selected Mr. Raabe for the district's Pro Bono Award for his service to indigent clients. In addition, he is listed as one of the Top 50 Lawyers in Connecticut by Super Lawyers® 2012 (Super Lawyers is a registered trademark of Key Professional Media, Inc.).

Mr. Raabe is admitted to practice in the U.S. Supreme Court, the Courts of Appeals for the First, Second, and D.C. Circuits, the U.S. District Courts for Connecticut and the Eastern and Southern Districts of New York, the U.S. Tax Court and the state of Connecticut. He is an honors graduate of Valparaiso University and Western New England College of Law, where he served as Editor-in-Chief of the Law Review. Following graduation, Mr. Raabe served as the law clerk for the Honorable Arthur H. Healey of the Connecticut Supreme Court.

Mr. Raabe is a commercial, instrument-rated pilot and is active in general aviation. He serves as a volunteer pilot for Angel Flight Northeast, which provides free air transportation to people requiring serious medical care.

**Seth R. Klein** graduated *cum laude* from both Yale University and, in 1996, from the University of Michigan Law School, where he was a member of the Michigan Law Review and the Moot Court Board and where he was elected to the Order of the Coif.  After clerking for the Hon. David M. Borden of the Connecticut Supreme Court, Mr. Klein served as an Assistant Attorney General for the State of Connecticut, where he specialized in consumer protection matters and was a founding member of the office's electronic commerce unit.  Mr. Klein thereafter joined the reinsurance litigation group at Cadwalader, Wickersham & Taft LLP in New York, where he focused on complex business disputes routinely involving hundreds of millions of dollars.  At IKR, Mr. Klein's practice continues to focus on consumer protection matters as well as on complex securities and antitrust litigation.

*Douglas P. Needham* received his Bachelor of Science degree from Cornell University in 2004 and his Juris Doctorate from Boston University School of Law in 2007.  At Boston University, Mr. Needham was the recipient of a merit scholarship for academic achievement and a member of the school's Moot Court Team.  Mr. Needham practiced law for six years in Syracuse, New York, devoting his practice to trial and appellate litigation in state and federal court.  He moved to Connecticut in May of 2013 to join LeClair Ryan, A Professional Corporation, and became a partner at that firm in 2014.  At LeClair Ryan, Mr. Needham prosecuted and defended a variety of business tort claims, including many for breach of fiduciary duty and fraud, in Connecticut, New York and Massachusetts.

Mr. Needham joined IKR in 2016.  His practice focuses on fiduciary litigation under ERISA as well as consumer protection and fraudulent business practices.

*Christopher M. Barrett* has been an integral member of litigation teams responsible for securing monetary recoveries on behalf of plaintiffs that collectively exceed $150 million.  In 2015, he was selected by Super Lawyers magazine as a Rising Star. Super Lawyers Rising Stars recognizes top up-and-coming attorneys who are 40 years old or younger, or who have been practicing for 10 years or less.

Prior to joining the Firm, Mr. Barrett was associated with Robbins Geller Rudman & Dowd, where his practice focused on prosecuting class actions on behalf of plaintiffs, and Mayer Brown, where his practice focused on complex commercial litigation.

Mr. Barrett received his J.D., magna cum laude, from Fordham University School of Law where he served as a member of the Fordham Law Review, and was

inducted into the Order of the Coif and the honor society Alpha Sigma Nu. For his work in the law school's law clinic, he was awarded the Archibald R. Murray Public Service Award. He earned his B.S. in Finance from Long Island University. During law school, Mr. Barrett served as a judicial intern to two United States District Judges (S.D.N.Y. and E.D.N.Y.) and a New York Supreme Court Justice.

# Exhibit B

1659HIKms

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
                                    14 Civ. 1771(VB)
3    IN RE HIKO ENERGY, LLC,                   Decision
     ENERGY LITIGATION.
4
     ------------------------------x
5
                                        White Plains, New York
6                                       May 9, 2016
                                        2:40 p.m.
7
     Before:
8
                    THE HONORABLE VINCENT L. BRICCETTI,
9
                                        District   Judge
10
                              APPEARANCES
11

12   FINKELSTEIN BLANKINSHIP, FREI-PEARSON & GARBER, LLP
          Attorneys for Plaintiffs
13   TODD GARBER

14
     BOIES, SCHILLER & FLEXNER, LLP
15        Attorneys for Defendant HIKO Energy, LLC
     MOTTY SHULMAN
16   WILLIAM MARSILLO

17

18

19

20

21

22

23

24

25

1659HIKms

| | |
|---|---|
| 1 | THE DEPUTY CLERK:  In re HIKO Energy, LLC, Energy |
| 2 | Litigation. |
| 3 | Will counsel please note their appearance for the |
| 4 | record. |
| 5 | MR. GARBER:  Todd Garber for the plaintiffs, your |
| 6 | Honor. |
| 7 | MR. SHULMAN:  Motty Shulman and Bill Marsillo of |
| 8 | Boies, Schiller, for the defendant. |
| 9 | THE COURT:  Good afternoon. |
| 10 | Have a seat. |
| 11 | So this is on for a fairness hearing today.  And |
| 12 | you've submitted a proposed final judgment and order of |
| 13 | dismissal.  And I've read all your papers. |
| 14 | I just want to check for the record.  Is there |
| 15 | anyone -- there was one objector who you addressed in your |
| 16 | memo.  Is that person here today, as far you know? |
| 17 | MR. GARBER:  To my knowledge, no, your Honor. |
| 18 | THE COURT:  Okay.  So is there anyone else in the |
| 19 | courtroom who's here, either as an objector or who wants to be |
| 20 | heard in connection with this application, other than counsel? |
| 21 | I guess the answer is "No" to that? |
| 22 | MR. GARBER:  None that I'm aware of, your Honor. |
| 23 | THE COURT:  You agree with that? |
| 24 | Okay.  We just need to make a record here, and that's |
| 25 | what we're doing. |

1       All right.  I have some questions for you.  I'm

2   obviously familiar with the case because we've had a number of

3   conferences before, plus I had issued a decision at some point

4   in connection with -- I forget which one of the cases.  I guess

5   the Chen and Sasso cases before the case got re-assigned here.

6   Is that right?

7       MR. GARBER:  Correct, your Honor.

8       THE COURT:  And actually, that gives rise to my first

9   question.

10      This settlement is designed to settle all of the

11  lawsuits, the three that are pending in front of me, Chen and

12  Sasso which were consolidated under 14 Civil 1771, and

13  Bogdanski, which is 15 Civil 2024.  But you've told me about

14  two other cases, one in the Eastern District of Pennsylvania,

15  Kantor against HIKO, which is 14 Civil 5585, and Spillman

16  against HIKO, which is in Supreme Court New York County.

17      What happens with those cases as a result -- assuming

18  I approve the settlement, what happens with those cases?  I'm

19  just curious.  They're not in front of me.  Right?

20      MR. GARBER:  Correct, your Honor.

21      Upon entry of the final order of judgment in this

22  case, pursuant to the timing mechanism of any settlement

23  agreement, those cases will be dismissed, as well.

24      THE COURT:  Okay.  So that will be handled by counsel

25  and by the judges in those cases.  I don't have to actually do

1    anything.

2         MR. GARBER:  Correct, your Honor.

3         THE COURT:  All right.  Let's see here.

4         I had granted in part and denied in part HIKO's motion

5    to dismiss and strike class allegations on December 29th, 2014.

6    In March of 2015, the Bogdanski case was transferred.  Oh, I

7    see.  And I did formally consolidate that case with Chen and

8    Sasso on June 1, 2015.  Motion for preliminary approval of

9    class action settlement was filed November 2nd, 2015, and on

10   January 6th, 2016, I granted that motion; that is, I

11   preliminarily approved the settlement.

12        Now, the proposed final judgment and order of

13   dismissal which I referred to earlier had been attached, had

14   been submitted attached to the motion for preliminary approval.

15        Is that still the document that you're looking for me

16   to sign?

17        MR. GARBER:  Yes, your Honor.

18        THE COURT:  And this was filed in November of 2015.

19   Sometimes things change.  I just want to make sure that's still

20   the document, that's still the proposed order, that you're

21   looking for me to approve.

22        MR. GARBER:  That's certainly plaintiffs' position,

23   your Honor.

24        MR. SHULMAN:  Correct, your Honor.  No changes.

25        THE COURT:  Okay.

1              MR. GARBER:   I have additional copies for the Court's

2     convenience, if your Honor wishes.

3              THE COURT:   I don't need a copy at this point, because

4     I have mine.   And if I sign it, it will be docketed, so . . .

5              All right.   And I've reviewed all of the terms, the

6     settlement terms, for both the former and the current customers

7     and how they differ.   And I've also reviewed the application

8     for attorneys' fees and all of the affidavits that came with

9     that.   I've also reviewed the submissions regarding the

10    enhancement awards for the named plaintiffs.

11             Am I correct that -- well, I know I did the arithmetic

12    correctly.   I added up all the amounts in the various attorney

13    affidavits that had been submitted, and they exceed a million

14    dollars in total.   But the actual amount that you're seeking is

15    $975,000.   Is that correct?

16             MR. GARBER:   That's correct.   And that 975 also

17    includes our expenses, your Honor.

18             THE COURT:   Right.   So it's not as if it's 975, plus

19    you're going to seek some more at some point.   This is it.

20    This is the cap, including expenses.

21             MR. GARBER:   That's correct, your Honor.

22             THE COURT:   Got it.

23             Now, the motion for final approval was submitted on

24    April 26th, so a couple of weeks ago.   And at that time, you

25    advised me that there are 185,593 class members.   That's the

1    number I took from your submission.  And as of that date, 5,824

2    people had submitted claims.  That was from Page 15 of the

3    memorandum of law.  There were also 107 opt-outs.

4              So I guess my first question is:  The total number of

5    claims submitted, is it something more than 5824 at this point?

6    Do you know what the number is?

7              MR. GARBER:  Yes, your Honor.

8              The number is 6213.  And the number of opt-outs

9    increased by one to 108.

10             THE COURT:  Okay.  But there's only been one

11   objection.

12             MR. GARBER:  That's correct, your Honor.

13             THE COURT:  All right.  Now, I guess I was -- I'm not

14   sure the word "surprised" is the right word, but I did notice

15   that, and you talk about it at some length in your memorandum.

16   I did notice that the number of claims is really a pretty small

17   fraction of the total number of class members.  It's a little

18   bit more than what you had said in your papers, but it's still

19   in the neighborhood of three percent, a little bit more than

20   three percent.  Correct?

21             MR. GARBER:  I believe it comes out to now

22   three-point-four-something percent, your Honor.

23             THE COURT:  Okay.  Is that unusual, or typical?  I

24   mean, that means 96.6 percent of the class members have not

25   filed a claim -- correct? -- and their time to do so has

1    expired.

2                MR. GARBER:  Correct, your Honor.

3                I wouldn't say that it's unusual.  As we noted in our

4    papers, in consumer class actions, sometimes claims rates

5    average between three and five percent.  I would say that my

6    firm has been involved in a similar case to this case against

7    Enexco, and our claims rate was higher in that case.  But the

8    notice that we implemented in that case is identical to the

9    notice we've implemented in this case.  So you know, it's lost

10   upon me as to why more people didn't submit a claim for what we

11   believe is a substantial amount of money in a consumer case,

12   anywhere from 60 to $175, and particularly with direct notice

13   in this case, your Honor.  And the postcards went out.  And if

14   an address got bounced back, they went through the updating

15   process with Skip Trace and the like, and new postcards went

16   out, and direct notice was then received by all members of the

17   class.

18               THE COURT:  Well, I agree.  In these kind of consumer

19   settlements where the amount that each class member can receive

20   is relatively small, a lot of people just ignore it, because

21   they figure out it's just not worth the trouble of putting in a

22   claim.  Although the amounts here, like you say, they're not

23   de minimis.  I mean, they're anywhere between 60 and $175 per

24   person.  So the effect of this is that it's going to cost the

25   defendants a lot less in the end to settle the case than the

1      potential settlement would have cost them.  Right?  It's not a

2      $10 million settlement.  I don't know what it is, but it's a

3      lot less than that, a fraction of that.

4                  MR. GARBER:  The money out of defendant's pocket will

5      be less than the $10 million figure, I would say the result of

6      that is the value of the settlement.  And there are multiple

7      ways to settle consumer class actions, one being the claim-made

8      process and one being common fund.  And they both have pluses

9      and minuses, depending on the nature of the case.

10                 And in this case, we thought this structure made

11     sense, because you're getting direct notice to people, and

12     we're able to provide them with the opportunity to claim larger

13     amounts.  And if we had to set up a common fund, the amount

14     that defendant would have put forth in that common fund would

15     have been a lot less and therefore, with the ability to up

16     people to claim what they wind up getting would have been less

17     in conjunction, so . . .

18                 THE COURT:  All right.  But you're satisfied --

19                 And I take it you're satisfied, Mr. Shulman.

20                 -- that this number, while, in an absolute sense, it

21     is a low number, it's not a shocking number.  It's within the

22     normal range in class action settlements of this type, the gist

23     of what the memorandum of law says.

24                 MR. SHULMAN:  Yes.

25                 If I may, your Honor, I think one of the explanations

1    why the number may be what it is, is because there have been

2    several other settlements --

3              THE COURT:  Move that microphone closer.

4              MR. SHULMAN:  -- there have been several other

5    settlements HIKO entered into with various Attorneys General.

6    So this is not the first time that a HIKO customer is getting

7    money.  In fact, taking HIKO customers in New York, they're

8    getting a significant amount of money under this settlement.

9    And I think, as your Honor recognized, this is not a settlement

10   where they're getting two dollars, three dollars.  They're

11   getting $60 to $175.  As I tell my kids, that's real money.

12   But they've also gotten money through other avenues, namely,

13   actions by the Attorney General and funds that way.  So I think

14   that may explain why the numbers are what they are.

15             But certainly, we're comfortable that appropriate

16   notice was provided, and that everybody who would be entitled

17   to receive money has been notified.

18             THE COURT:  Okay.  Well, I'm satisfied by that, as

19   well.  There is certainly no indication whatsoever that people

20   did not receive the direct notice that was provided for in the

21   settlement.

22             All right.  I'm going to grant the motion, and I'm

23   going to sign the proposed order.  I'm going to put on the

24   record my reasons for doing that, because I think that I should

25   do so.

1       I think the reasons boil down to the fact that

2   continued litigation in this case would be expensive and

3   lengthy, which makes it expensive; also, the fact that the

4   parties have certainly vigorously litigated these cases so far.

5   As I indicated earlier, there was a motion to dismiss which I

6   decided.  And I think there was a motion for judgment on the

7   pleadings which followed the settlement in New Jersey.

8       Am I right about that?  Wasn't that the basis for that

9   motion, which eventually I never had to decide, because there

10  was a settlement?

11      MR. GARBER:  That's correct, your Honor.

12      That was related to the Chen and Sasso matters.  And

13  the defendants were going to bring similar motions in the

14  Bogdanski matter, as well as the Stillman matter, because the

15  AGs for those underlying classes, they had settled with them,

16  as well.  So it was an issue that pertained to all the class

17  members in these cases.

18      THE COURT:  Okay.  But the point that I'm trying to

19  make is that these cases were vigorously litigated.

20      I'm advised that the parties engaged in arm's-length

21  settlement negotiations.  And importantly, that included, as I

22  recall, a day-long mediation in a front of a qualified

23  mediator.  Right?

24      MR. GARBER:  Correct, your Honor.

25      THE COURT:  In addition to that, it seems to me that

1   the plaintiffs do face substantial hurdles in establishing

2   liability.  This is not a black-and-white case.  The defendants

3   contend that they adequately disclosed their rates.  Or the

4   defendant, I should say.  HIKO Energy contends that it

5   adequately disclosed its rates.

6        Then there is this other issue about the Chen and

7   Sasso actions and the possibility that they might be barred by

8   the doctrine of res judicata.

9        In addition to that, I'm advised that HIKO may not be

10  able to pay a substantially higher judgment.

11       So I'll touch on of all these in a moment, but those

12  are the key things that I think matter here.  And so for all

13  these reasons, I am going to approve the settlement.

14       So let me read into the record a brief —— well, I

15  guess it's not that brief, but let me read into the record the

16  summary of my reasons for approving the settlement.

17       First of all, the law favors compromise and settlement

18  of class action suits.  That's the Wal-Mart Stores case,

19  396 F.3d 96 (2d Cir. 2005).  Approval of a proposed class

20  action settlement is within the discretion of the district

21  court.  That's the Joel A. case, 218 F.3d 132 (2d Cir. 2000).

22       Before granting final approval of a class action

23  settlement, a reviewing Court must find that the settlement is

24  procedurally and substantively fair, reasonable, and adequate

25  under Rule 23(e)(1).  To do so, a Court looks at both the

1    settlement's terms and the negotiating process leading to the

2    settlement.  And a presumption of fairness, adequacy, and

3    reasonableness may attach to a class settlement reached in

4    arm's-length negotiations between experienced, capable counsel

5    after meaningful discovery.  That's from a different

6    Wal-Mart -- no.  I'm sorry.  It's from the same Wal-Mart Stores

7    case that I had cited earlier, 396 F.3d, at 116.

8            First, as to procedural fairness, to demonstrate that

9    a settlement is procedurally fair, its proponents bear the

10   burden of showing:

11           1.   That the settlement was reached through

12   arm's-length negotiation, and it is not collusive;

13           2.   That the proponents are counsel experienced in

14   similar cases;

15           3.   That there has been sufficient discovery to enable

16   counsel to act intelligently; and

17           4.   That the number of objectors or their relative

18   interest is small.

19           The Court finds that that burden has been met here.

20   Those factors are cited in In re McDonnell Douglas Equipment

21   Leasing, 838 F. Supp. 729 (S.D.N.Y. 1993).

22           First, as far as the arm's-length negotiation is

23   concerned, the Court is satisfied that the settlement here was

24   reached through arm's-length negotiations.  An independent and

25   experienced mediator, Vivien Shelanski of JAMS, which is a

**1**   company that provides mediation and arbitration services,

**2**   conducted a day-long mediation session which resulted in the

**3**   settlement.  And common sense and also many Courts within the

**4**   Second Circuit will tell you that the participation of a

**5**   respected and neutral mediator gives the Court confidence that

**6**   the negotiations were conducted in an arms-length, noncollusive

**7**   manner.

**8**         Second, class counsel are experienced and qualified.

**9**   They have each described their qualifications, including

**10**  experience and various accolades, in declarations submitted in

**11**  connection with their motion for final approval.  It is beyond

**12**  question that these counsel meet the qualification standard

**13**  required in the Second Circuit.

**14**        Third, there has been sufficient discovery to enable

**15**  counsel to act intelligently.  The parties have represented to

**16**  this Court that each side conducted a thorough investigation of

**17**  their opponent's claims and defenses, and have engaged in

**18**  extensive formal and informal discovery in the actions, and, as

**19**  such, were well positioned to evaluate the strengths and

**20**  weaknesses of the claims and defenses asserted, the potential

**21**  damages incurred by the class, and the fairness of the

**22**  settlement.  That's all taken from the memorandum in support of

**23**  the motion, at Pages 2 and 17.  In particular, each side served

**24**  interrogatories and document demands, responded to the demands

**25**  they received, and they met and conferred on discovery issues.

1    Plaintiffs hired an expert, Dr. Frank Felder from Rutgers

2    University, who evaluated HIKO's rates as compared to those of

3    its competitors and other local utilities.

4         Fourth, the number of objectors is extremely low.

5    Only one individual out of over 185,000 class members objected

6    to the proposed settlement, and only 108 individuals, which is

7    well under one percent of the class -- in fact, it's about .06

8    percent -- opted out of this proposed settlement.  So this very

9    low number of objectors and opt-outs as a percentage of the

10   total class members indicates that the proposed settlement is

11   fair.  And for that proposition, I'll cite to Charron v.

12   Pinnacle Group, 874 F.Supp.2d 179, a Southern District case

13   from 2012, and Wright v. Stern, 553 F.Supp.2d 337, a Southern

14   District case from 2008.

15        After consideration of these factors, the Court finds

16   that the proposed settlement is procedurally fair.

17        Now, turning to substantive fairness, to determine

18   whether a class settlement is fair, reasonable, and adequate on

19   substantive grounds, Courts look to the familiar nonexhaustive

20   list of factors set forth by the Second Circuit in the Detroit

21   v. Grinnell case, which I'll refer to as the Grinnell factors.

22   That's 495 F.2d 448 (2d Cir. 1974).  These factors include:

23        1.  The complexity, expense, and likely duration of

24   the litigation;

25        2.  The reaction of the class to the settlement;

1          3.   The stage of the proceedings and the amount of

2    discovery completed;

3          4.   The risks of establishing liability;

4          5.   The risks of establishing damages;

5          6.   The risks of maintaining the class action through

6    trial;

7          7.   The ability of the defendants to withstand a

8    greater judgment;

9          8.   The range of reasonableness of the settlement in

10   light of the best possible recovery; and

11         9.   The range of reasonableness of the settlement fund

12   to a possible recovery in light of all the attendant risks of

13   litigation.

14         In finding that a settlement is fair, not every factor

15   must weigh in favor of settlement.  Rather, the Court should

16   consider the totality of these factors in light of the

17   particular circumstances.  That's from In re Marsh ERISA

18   Litigation, 265 F.R.D. 128, a Southern District case from 2010.

19         On balance, the Court finds that the vast majority of

20   these factors weigh towards final approval of the settlement

21   agreement.

22         First of all, the case is complex, expensive, and will

23   likely last a long time if it is not settled.  Defendants, who

24   are represented by accomplished counsel, have already moved to

25   dismiss, and certainly could be expected to mount a vigorous

**1**  defense.  Class certification and discovery would be

**2**  complicated and time-consuming, especially because experts will

**3**  need to be engaged and deposed.  Forcing plaintiffs to wait

**4**  until after trial and any associated appeals for a potential

**5**  resolution would likely delay any recovery by years.  In

**6**  contrast, the proposed settlement would grant relief to all

**7**  class members without subjecting them to the risks, complexity,

**8**  duration, and expense of continuing litigation.

**9**          Second, the reaction of the class as a whole supports

**10**  approval.  As I mentioned, only one individual, out of roughly

**11**  186,000 class members, objected to the proposed settlement, and

**12**  only 108 individuals opted out of the proposed settlement.

**13**  This is a very low number when compared with the more than

**14**  186,000 class members of whom 6,213 have filed claims to date.

**15**  The low number of objectors and opt-outs indicates that the

**16**  proposed settlement is fair.

**17**          In the Wal-Mart case that I cited earlier, the Second

**18**  Circuit indicated that the reaction of the class is often

**19**  considered the most important factor in determining whether the

**20**  proposed settlement is fair.

**21**          Third, proceedings have advanced far enough to allow

**22**  the parties to resolve the case.  This factor requires the

**23**  Court to consider whether the parties have adequate information

**24**  about their claims.  When a settlement is negotiated prior to

**25**  class certification, as is the case here, it is subject to a

**1**    higher degree of scrutiny in assessing its fairness.  However,

**2**    formal discovery is not a prerequisite.  The question is

**3**    whether the parties had adequate information about all their

**4**    claims.   There are a number of cases that stand for those

**5**    propositions.

**6**         Here, although class certification has not yet

**7**    occurred, there has been significant discovery here to provide

**8**    the parties with enough information about the merits of their

**9**    case to allow them to fairly assesses a resolution of the case.

**10**   The Court is convinced that plaintiffs' counsel understand the

**11**   relative strengths and weaknesses of their case, and have

**12**   weighed their position based on a full consideration of the

**13**   possibilities facing them.

**14**        Now, with respect to the fourth through sixth Grinnell

**15**   factors —— the risk of establishing liability and damages and

**16**   establishing a class and maintaining it through trial —— they

**17**   are all significant.  As the parties point out in their joint

**18**   memorandum in support of the settlement or in support of

**19**   approval of the settlement, HIKO maintains that it did not

**20**   engage in the activities alleged, and would put up a vigorous

**21**   fight if the case were to continue.  Among other things, HIKO

**22**   would certainly argue that class certification is inappropriate

**23**   because customers paid at different rates, and, therefore,

**24**   their damages are difficult to calculate and vary widely

**25**   between customers.  Litigating class certification motions for

**1**     summary judgment, motions for decertification and, eventually,

**2**     trial, would all be extremely complex, difficult, and

**3**     time-consuming for both parties, or for all parties.

**4**           Given the large size of the class, the complicated

**5**     claims asserted by plaintiffs, the expected need for multiple

**6**     expert opinions, defendant's continued contention it engaged in

**7**     no wrongdoing, and the heightened legal uncertainty necessarily

**8**     injected by significant Supreme Court authority relevant to the

**9**     propriety of class certification, the Court finds this factor

**10**    weighs substantially in favor of the proposed settlement.

**11**          Seventh, the parties contend that HIKO almost

**12**    certainly would not have been able to bear the enormously large

**13**    statutory and compensatory damages award that could be assessed

**14**    were the case to proceed through trial.  That's a quote from a

**15**    memorandum of law, at Page 20.  They maintain that while the

**16**    defendant's ability to withstand a greater judgment, standing

**17**    alone, does not suggest the settlement is unfair, they

**18**    maintain -- they maintain that while the defendant's ability to

**19**    withstand a greater judgment, standing alone, does not suggest

**20**    a settlement is unfair, the fact that HIKO could not have

**21**    withstood a judgment in this case augers in favor of approval.

**22**          As to the eighth and ninth factors, the settlement is

**23**    reasonable, both in light of the best possible recovery and in

**24**    light of the risks attendant in litigation.  In the Second

**25**    Circuit -- and this is again from the Wal-Mart case that I

**1**    cited earlier, 396 F.3d, at 96 -- there is a range of

**2**    reasonableness with respect to settlement, a range which

**3**    recognizes the uncertainties of law and fact in any particular

**4**    case, and the concomitant risks and costs necessarily inherent

**5**    in taking any litigation to completion.  "The fact that a

**6**    proposed settlement may only amount to a fraction of the

**7**    potential recovery does not, in and of itself, mean that the

**8**    proposed settlement is grossly inadequate and should be

**9**    disapproved."  That last sentence is a quote from the Grinnell

**10**   court case, 495 F.2d, at 455.

**11**           Here, if they litigated their claims, New York

**12**   consumers could receive a statutory penalty of $500 under

**13**   General Business Law Section 349-d.  On the other hand, they

**14**   could lose at trial and get nothing.  The parties assert -- and

**15**   the Court agrees -- that under these circumstances, a

**16**   settlement of six to nine million dollars, if all claimants

**17**   take either the cash option or the credit option, falls well

**18**   within the range that Courts have traditionally found to be

**19**   fair and adequate under the law.

**20**           Moreover, the settlement allows for certain payment to

**21**   claimants now, not a speculative potential recovery years down

**22**   the road.  And there is a case, Teachers' Retirement System

**23**   against A.C.L.N., 2004 Westlaw 1087261, a Southern District

**24**   case from 2004, where this quote is from:  Quote, "Above all,

**25**   the proposed settlement provides for payment to class members

1    now, not some speculative payment of a hypothetically larger

2    amount years down the road," end quote.  And that's directly

3    applicable to this case.

4         In sum, after consideration of the monetary relief

5    provided by the settlement and the complexities inherent in the

6    case, the Court finds that the eighth and ninth Grinnell

7    factors weigh in favor of approval.  The settlement is

8    reasonable, both in light of the best possible recovery and in

9    light of the risks attendant in litigation.

10        Accordingly, the Grinnell factors weigh clearly in

11   favor of approving the proposed settlement, and the Court

12   concludes that the proposed settlement is substantively fair.

13        Now, there is one objection.  And I suppose it's not

14   absolutely necessary that I address it, because I do feel that

15   the proposed settlement is fair for the reasons I've just

16   stated.  But so that the record is complete, I will address the

17   sole objection which was submitted on April 4th, 2016, by Mark

18   Littmann, a former HIKO customer.  His letter is docketed on

19   the ECF Docket as Docket Number 78.

20        Mr. Littmann makes two primary objections.

21        First, he calculated that HIKO overcharged him in the

22   amount of $228.93.  And therefore, he argues that the capped

23   amount of $60 he would receive under the class settlement is

24   insufficient.

25        The parties correctly point out that even if

1    Mr. Littmann is right, he is still getting approximately 26

2    percent of his actual damages, which they argue is a great

3    recovery.  And while the Court doesn't necessarily agree that

4    26 percent is great -- quote-unquote "great" -- the Court

5    agrees that this recovery is certainly reasonable.  That's

6    really what matters, especially given the extensive costs

7    entailed in continuing to litigate the claims.

8         Second, Mr. Littmann argues that the attorneys' fees

9    and expenses are too high under the settlement.  He divided the

10   total attorneys' fee of $975,000 by what he thought was the

11   total number of customers who were sent claim forms, 25,000,

12   and concluded that the attorneys were receiving $39 per

13   claimant, which he argues is too much for a maximum recovery

14   per claimant of $60.

15        Now, the parties argue that this is misguided, that

16   his approach in this regard is misguided, because, one, the

17   attorneys' fees are only roughly nine and a half to thirteen

18   and a half percent of the total settlement value, which is the

19   typical way the fairness of fees is measured; two, the fees do

20   not burden any individual class members, because HIKO has

21   agreed to pay them directly and separately from the payments to

22   the class members.  In other words, it's not coming out of the

23   money available to class members, it's coming directly from

24   HIKO.

25        And third, Mr. Littmann has an inaccurate number of

1      claimants.  In fact, there are 185,593 class members.  So even

2      using Mr. Littmann's approach, the attorneys are only getting

3      roughly $5.25 per class member.

4              Again, the Court agrees with the parties.

5      Mr. Littmann's points are thoughtful, and the Court appreciates

6      them.  But in the end, they're insufficient to up-end this

7      well-considered and diligently negotiated settlement.

8              Ultimately, settlements are not required to be

9      perfect.  In fact, if one side or the other thought a

10     settlement was perfect, then it's probably not a very good

11     settlement.  Like many class actions, this is a case where the

12     perfect could easily become the enemy of the good, and that

13     would not be in the best interests of the class as a whole.

14     That's a quote from the Charron case which I mentioned earlier,

15     874 F.Supp.2d 179, a Southern District case from 2012.

16             Accordingly, I will grant the motion and approve the

17     proposed settlement.

18             So I have in front of me the proposed final judgment

19     and order of dismissal.  I haven't been advised that, even

20     though this was prepared and submitted back in November, there

21     is any reason to change any of the aspects of it.  This is 14

22     Civil 1771.  So I'm going to go ahead and sign this document

23     today, which is May 9th, 2016.

24             Okay.  So that will get docketed on ECF, and you'll

25     receive a copy of it that way.

1659HIKms

1          All right.  Is there anything else we need to do

2    today?

3          MR. GARBER:  Nothing from plaintiffs, your Honor.

4          MR. SHULMAN:  Nothing from defendants, your Honor.

5          THE COURT:  All right.  Thank you all very much.  As

6    usual, you did an excellent job.

7          Good luck with getting all the details sorted out.

8    And have a good day.

9          ALL COUNSEL:  Thank you, your Honor.

10          THE DEPUTY CLERK:  All rise.  The Court will be in

11    recess.

12                          -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

25