.
**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

PAUL EDWARDS,
GERRY WENDROVSKY,
SANDRA DESROSIERS, and
LINDA SOFFRON, on behalf of themselves
and all others similarly situated,
    Plaintiffs,

    v.                     No. 3:14-cv-01714 (VAB)

NORTH AMERICAN POWER & GAS, LLC,
    Defendants.

## RULING AND ORDER

Paul Edwards, on behalf of himself and all persons similarly situated (collectively

"Plaintiffs"), filed the initial Class Action Complaint, alleging that North American Power &

Gas, LLC ("NAPG" or "Defendant") falsely advertised low rates in order to induce customers

into switching their energy provider. Plaintiffs claim that NAPG expressly breached its contracts

with class members, as well as the covenant of good faith and fair dealing, by allegedly

advertising its variable rates would fluctuate with the market but failing to do so. *See* Second

Am. Compl. ¶¶ 65 –76, ECF No. 63. Additionally, several of the plaintiffs allege violations of

the Connecticut Unfair Trade Practices Act (CUTPA) on behalf of a putative sub-class.

Following settlement discussions between the parties in this action and those pending

elsewhere, the parties reached a settlement under which they intend to resolve five cases

involving NAPG's alleged misrepresentations. *See generally* Class Action Settlement Agreement

("Settlement Agreement"), ECF No. 116-1. The proposed settlement would involve the claims of

class members in eleven states for breach of contract and alleged violation of state consumer protection laws. After notifying the Court of the proposed settlement, Plaintiffs moved for preliminary approval on January 16, 2018. ECF No. 114. The Court granted preliminary approval on March 30, 2018. *See* Order, ECF No. 126.

Plaintiffs now move for final approval of the class action settlement. *See* Pls. Mot. for Final Approval of Class Action Settlement, ECF No. 130. They seek the following:

1. certification of the settlement class;

2. appointment of Plaintiffs as representatives of the class;

3. appointment of their lawyers as class counsel;

4. approval of the Class Action Settlement; and,

5. approval of their proposed attorneys' fees and expenses.

*Id.* at 1-2. The Court took the motion under advisement at a final fairness hearing, held on August 1, 2018. *See* Min. Entry, ECF No. 132.

Upon reviewing the Settlement Agreement, all the filings submitted in connection with the motion, and the information presented at the hearing, the motion is **GRANTED**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

This settlement agreement seeks global resolution of several different putative class actions, currently pending against NAPG in this Court and elsewhere.

### A.     The Edwards Action

Mr. Edwards filed the initial Complaint in this lawsuit on November 18, 2014, as the sole named plaintiff. *See* Compl., ECF No. 1. He sought to bring the lawsuit "on behalf of himself and all class of all similarly situated customers . . . in Connecticut, Rhode Island, New

Hampshire, and Maine, arising out of [NAPG's] unfair, deceptive, unconscionable and bad faith billing . . . ." *Id. ¶* 2.

NAPG moved to dismiss the complaint. The Court granted the motion in part. *See* Ruling on Motion to Dismiss, ECF No. 39. The Court found that Mr. Edwards lacked standing to bring claims under Maine's Unfair Trade Practices Act, New Hampshire's Consumer Protection Act, and Rhode Island's Unfair Trade Practice and Consumer Protection Act. *Id.* at 2. The Court denied the motion to dismiss as to the CUTPA claims and the breach of the covenant of good faith and fair dealing. *Id.* The dismissal of the other claims was without prejudice, and Edwards subsequently moved to amend the complaint.

The Second Amended Complaint was filed on June 3, 2016. *See* Second Am. Compl. ("SAC"), ECF No. 63. The Second Amended Complaint was filed on behalf of Edwards (a Connecticut citizen), Gerry Wendrovsky (a citizen of New York who owns property in Connecticut), Sandra Desrosiers and Linda Soffron (both citizens of New Hampshire). SAC ¶¶ 8–12. They allege that North American Power was an electric supplier, purchasing power on the wholesale market and selling it to consumers. *Id.* ¶ 21. They allege that NAPG charged a low promotional rate, fixed for several months, which then changed to a variable rate following the end of the introductory period. *Id.* ¶ 24. NAPG allegedly represented that the variable rate following the introductory rate would be based on the wholesale market rate, *id.* ¶ 25; instead, Plaintiffs claim NAPG "increase[ed] the rates charged to class members when wholesale prices rose" and kept rates "at a level as much as ***double, triple or quadruple*** the wholesale market rates when the wholesale prices fell." *Id.* ¶ 31 (emphasis in original).

Plaintiffs argue that this pricing scheme represents a breach of the contracts signed between themselves and NAPG, *id.* ¶¶ 65–68, as well as a breach of the implied convenant of

good faith and fair dealings. *Id.* ¶¶ 69–76. They allege these violations on behalf of a class of those similarly situated in Connecticut and New Hampshire. *Id.* ¶ 54. Additionally, the plaintiffs seek to certify a subclass of NAPG's Connecticut customers, alleging violations of the Connecticut Unfair Trade Practices Act (CUTPA). *Id.* ¶¶ 55, 77-84.

Discovery began, and Plaintiffs moved for class certification on May 24, 2017. *See* Pls. Mot. Class Certification, ECF No. 82. Before the Court could rule on the motion, however, both NAPG and the Plaintiffs moved to stay the proceedings. *See* Def. Mot. to Stay, ECF No. 98. The motion stated that "the Parties have agreed to a global mediation" to attempt to resolve several similar matters pending against NAPG, including the *Edwards* matter. *Id.* at 1. The Court granted a stay. Order, ECF No. 99.

On October 31, 2017, the parties informed the Court they were unable to reach a settlement. *See* Joint Status Report, ECF No. 102. The Court lifted the stay, Order, ECF No. 103, and NAPG moved for summary judgment. *See* Def. Mot. Summ. J., ECF No. 105.

### B. Other Actions

The *Edwards* action is not the only case pending that involves NAPG's alleged misconduct. Three similar lawsuits are currently pending in the District of Connecticut. *Arcano v. North American Power & Gas*, LLC, No. 3:16-cv-1921-WWE (D. Conn. filed October 31, 2016) ("*Arcano* Action"); *Tully v. North American Power & Gas, LLC*, No. 15-cv-00469-WWE (D. Conn. filed March 31, 2015) ("*Tully* Action"); *Fritz v. North American Power & Gas, LLC*, No. 3:14-cv-0634-WWE (D. Conn. filed May 6, 2014) ("*Fritz* Action"). In addition, another case is currently pending in the Northern District of Illinois, *Zahn v. North American Power & Gas*, LLC, No. 14-cv-8370 (N.D. Ill., filed October 24, 2014) ("*Zahn* Action") and the Southern

District of New York. *Claridge v. North American Power & Gas, LLC*, 15-cv-1261 (PKC) (S.D.N.Y. filed February 20, 2015) ("*Claridge* Action").

The *Fritz* Action involves alleged violations of New Jersey's Consumer Fraud Act, as well as contractual claims. The *Tully* Action involves alleged violations of the Rhode Island Deceptive Trade Practices Act, the New Jersey Consumer Fraud Act, the Maryland Consumer Protection Act, the Connecticut Unfair Trade Practices Act, the Maine Unfair Trade Practices Act, the New Hampshire Consumer Protection Act, the Georgia Fair Business Practices Act, the Ohio Consumer Sales Practices Act, the Pennsylvania Unfair Trade Practices and Consumer Protection Law, and the Texas Deceptive Trade Practices Act, among other state law claims. The *Arcano* action involves alleged violations of the Rhode Island Unfair Trade Practices and Consumer Protection Act, as well as contractual claims. The *Tully* and *Fritz* cases were consolidated on June 23, 2015. The *Arcano* case was originally consolidated on June 20, 2016. The court formally severed the *Arcano* case from the other two, but stayed it on request of the parties pending the resolution of the *Tully* and *Fritz* actions. The court then stayed the consolidated *Tully* and *Fritz* actions pending settlement negotiations, and then administratively closed the cases.

The *Claridge* Action, filed on behalf of New York consumers, alleged violations of New York's deceptive trade practices law. *See Claridge v. N. Am. Power & Gas, LLC*, No. 15-cv-1261 (PKC), 2016 WL 7009062, at *1 (S.D.N.Y. Nov. 30, 2016). On November 30, the court in *Claridge* certified a class of "all New York North American Power & Gas, LLC customers who paid North American Power & Gas, LLC's variable rate" on or after February 20, 2012. *Id.* The parties in *Claridge* also sought the court's preliminary approval of a settlement that would resolve all the pending NAPG actions and certify a nation-wide class of NAPG customers. The

court rejected that proposal, but approved a later settlement agreement pertaining to New York customers. *See* Order, *Claridge v. N. Am. Power & Gas, LLC*, No. 15-cv-1261 (PKC), ECF No. 139 (S.D.N.Y. March 13, 2018).

The *Zahn* Action appears to assert causes of action on behalf of Illinois consumers. Pls. Mem. at 6. The district court initially granted NAPG's motion to dismiss, but, on appeal, the Seventh Circuit chose to certify a question to the Illinois Supreme Court and requested that the court determine if the Illinois Commerce Commission ("ICC") would have exclusive jurisdiction over the claim. *Id*. The Illinois Supreme Court held that the ICC did not have exclusive jurisdiction and the Seventh Circuit then reversed the district court decision. The *Zahn* Action is currently stayed pending approval of the settlement at issue here. *Id*.

### C. Settlement Agreement

On December 20, 2017, the parties informed the Court at a telephonic status conference that they had reached a preliminary agreement to settle the case. *See* Order, ECF No. 113. Plaintiffs then moved for preliminary settlement approval. *See* Pls. Mot. for Prelim. Approval, ECF No. 114.

In their filing, Plaintiffs noted that the parties began discussing settlement of the *Fritz* Action in 2015. Pls. Mem. in Supp. ("Pls. Preliminary Certification Mem.") at 7, ECF No. 115. The parties attempted mediation in December 2015 and, again in February 2016, but neither resulted in a settlement. *Id*. In February 2017, they tried again, unsuccessfully, to mediate a settlement. *Id*. Likewise, the *Edwards* Action went to mediation a month later and the parties also were unsuccessful. *Id*.

On June 27, 2017, the parties appeared to reach a settlement for the *Fritz* and *Claridge* cases, and sought preliminary approval in the Southern District of New York, where *Claridge*

was then pending. *Id.* at 8. *Edwards* counsel opposed; the Court ultimately denied the motion for preliminary approval. *Id.* Finally, the parties in all actions agreed to mediate jointly and, after two mediation sessions, entered into a settlement on January 16, 2018. *Id.; see also* Class Action Settlement Agreement ("Settlement Agreement"), ECF No. 116-1.

The settlement seeks to resolve five separate cases: *Edwards v. North American Power & Gas*, No. 3:14-cv-01724 (D. Conn. filed November 18, 2014); *Arcaro v. North American Power & Gas, LLC*, No. 3:16-cv01921-WWE (D. Conn. filed October 31, 2016); *Tully v. North American Power & Gas, LLC*, No. 15-cv-00469-WWE (D. Conn. filed March 31, 2015); *Fritz v. North American Power & Gas, LLC*, No. 3:14-cv-0634-WWE (D. Conn. filed May 6, 2014); and *Zahn v. North American Power & Gas, LLC*, No. 14-cv-8370 (N.D. Ill., filed February 20, 2015). *See* Settlement Agreement § I.

The parties stated that they "recognize and acknowledge the benefits of settling these cases," *id.* ¶ 1.5, and defined the class as "all Persons who were NAPG Variable Rate Customers during the Class Period in Connecticut, Illinois, Maryland, Maine, New Hampshire, New Jersey, Ohio, Pennsylvania, Rhode Island, Georgia or Texas." Settlement Agreement ¶ 2.11. The class period is defined as between February 20, 2012 through June 5, 2017. *Id.* ¶ 2.13. The settlement agreement sets out a series of procedures for its approval, and noted that, while a class should be certified for settlement purposes, Defendants would reserve the right to challenge class certification, if the Court denied preliminary approval of the agreement. *Id.* § IV.

The agreement provides that NAPG customers who properly file a claim will be given $0.00351 per kilowatt hour, if they are variable rate customers receiving electric supply or $0.0195 per therm, if they receive natural gas supply, with a minimum benefit of $2.00. *Id.* ¶ 5.1. The total benefit, however, "payable by NAPG shall be subject to a $16,053,000 cap. In the

event that the value of the benefits claimed exceeds $16,053,000, the benefit payable to each

NAPG Variable Rate Customer will be reduced *pro rata* based on the individual's electric supply

and/or natural gas supply use while on a variable rate plan." *Id.* Named plaintiffs would receive

up to $5,000 as class representatives, and attorney's fees would be capped at $3,699,000. *Id.* ¶

7.5.

Parties also agreed to release claims, defined as:

> any and all claims, demands, rights, damages, obligations, suits, debts, liens, contracts, agreements, judgments, expenses, costs, liabilities, and causes of action of every nature and description, including claims for attorneys' fees, expenses and costs, whether known or unknown, suspected or unsuspected, existing now or arising in the future that (a) is or are based on any act, omission, inadequacy, misstatement, representation, harm, matter, cause or event whatsoever that has occurred at any time from the beginning of time up to and including the end of the Class Period and (b) arise from or are related in any way to this lawsuit or class action.

*Id.* ¶ 2.34.

**D.    Preliminary Approval of the Settlement Agreement**

Following the initial motion for preliminary approval, the Court held a hearing on

January 29, 2018. *See* Min. Entry, ECF No. 118. The Court requested supplemental briefing

addressing three questions:

1.    Does the Court have jurisdiction to approve a class action settlement that addresses the state law claims of states where the named representatives may lack standing to bring those claims?

2.    If the Court possesses jurisdiction, can the named representatives fairly and adequately protect the interests of class members from other states and whose claims would be subject to state laws different from that of the named representatives? *See* Fed. R. Civ. P. 23(a)(4).

3.    Do the statutory and contractual state law claims included under the settlement "differ in a material manner that precludes the predominance of common issues" under Fed. R. Civ. P. 23(b)(3)? *See In re U.S. Foodservice Inc. Pricing Litigation*, 729 F.3d 108, 127 (2d Cir. 2013).

*See* Order, ECF No. 119.

The Court then granted preliminary approval on March 30, 2018. *See* Ruling and Order, ECF No. 126. In response to its initial questions, the Court found that "preliminary certification is appropriate because claims here would 'focus predominantly [sic] on common evidence' to determine whether NAPG was liable and rest on breach of contract claims where there is not significant variation." *Id*. at 10 n.2 (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 125 (2d Cir. 2013)). The Court held that, for the purposes of preliminary approval, the class met the requirements of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure. *Id.* at 11-12. The Court appointed the named plaintiffs as representatives of the settlement class and their counsel as class counsel. *Id.* at 13.

The Court granted preliminary approval of the Settlement Agreement's terms, while noting that preliminary approval required only at most "a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness," *Id* at 13–14 (quoting *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 101 (D. Conn. 2010)). The Court held that the proposed settlement met both the substantive and procedural requirements. *Id.* at 16.

The Court also approved the form and content of the notice to be provided to the class, set a schedule for final approval and the date of the final fairness hearing. *Id.* 16–18. Finally, it also approved a claims administration plan and procedure through which class members could opt-out. *Id.* at 18.

### E.     Notice to the Class

The parties engaged Heffler Claims Group ("Heffler"), a third party, to administer notice of the settlement to the class. *See* Decl. of Joseph F. Mahan ("Mahan Decl."), ECF No. 130-7.

Heffler identified 491,126 unique records from a list of 531,847 class members provided by the parties.[1] Mahan Decl. ¶ 5. Heffler then mailed postcards to the 491,126 identified class members. The postcard directed class members to the website or Heffler for more information, and provided information on how to submit a written request for exclusion. *Id.* ¶ 10. The postcard also stated that exclusions, objections, and claim forms must be post-marked or submitted by June 26, 2018. *Id.* Additionally, Heffler conducted additional research on any notices identified by the USPS as undeliverable. *Id.* ¶ 13. Heffler then sent a second, identical postcard to any updated addresses identified. *Id.*

On April 3, 2018, Heffler also published the Settlement Agreement, notice, claim forms, and other case documents to a dedicated website available to the public at www.electricityandgassettlement.com. The website explained the litigation and the settlement, as well as the on-line claim form submission process. *Id.* ¶ 9.

Heffler also set up a toll-free number, providing class members with general information about the litigation, the settlement, and the claim form process. *Id.* ¶ 7.
Finally, under the Class Action Fairness Act, 28 U.S.C. § 1711, *et. seq.* ("CAFA"), the parties also sent a letter, on January 26, 2018, to the United States Attorney General and fifty-one states and territories. *Id.* ¶ 6. The notice provided a copy of the Complaint, notice of a hearing, copies of the notice forms, the proposed settlement, and the class definition. *See* 28 U.S.C. § 1715(b) (listing requirements).

---

[1] Heffler identified 40,721 as duplicate records. Mahan Decl. ¶ 5.

### F.     The Final Claims

Plaintiffs now move for approval of the class settlement. They summarize the final results as of June 8, 2018. *See* Pls. Mem. at 18. A total of 16,890[2] claims have been submitted and the average claimant will receive $50:

- Approximately 4,700 will receive between $2.00 and $9.99;

- Approximately 4,500 will receive between $10.00 and $29.99;

- Approximately 2,900 will receive between $30.00 and $49.99;

- Approximately 2,400 class members will receive over $100; and,

- Approximately 200 class members will receive over $300.

*Id.*

Additionally, no claimant has objected, and only seventeen plaintiffs opted out of the settlement. Status Report ¶ 2.

## II.     STANDARD OF REVIEW

Rule 23(e) requires that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Thus, "[b]efore reaching the merits of the proposed settlement," this Court "must first ensure that the settlement class, as defined by the parties, is certifiable under the standards of Rule 23(a) and (b)." *Bourlas v. Davis Law Assocs.*, 237 F.R.D. 345, 349 (E.D.N.Y. 2006); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 270 (2d Cir. 2006) (holding that Rule 23(a) and (b) analysis is independent of Rule 23(e) fairness review).

---

[2] In their most current status report, Plaintiffs state that there were 20,862 claims filed as of July 23, 2018. *See* Pls. Status Report ¶ 3.

"Rule 23(a) states four threshold requirements applicable to all class actions: (1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical ... of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (quoting Fed. R. Civ. P. 23(a)). "In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Id*. at 614.

These requirements apply equally to "conditional certification of a class for settlement purposes." *Cohen v. J.P. Morgan Chase & Co*., 262 F.R.D. 153, 157 (E.D.N.Y. 2009); *see also Reade-Alvarez v. Eltman, Eltman & Cooper, P.C*., 237 F.R.D. 26, 31 (E.D.N.Y. 2006) ("Certification of a class for settlement purposes only is permissible and appropriate, provided these [Rule 23(a) and (b) ] standards are met."). The settlement-only class certification inquiry requires this Court to "demand undiluted, even heightened, attention in the settlement context" to Rule 23's "specifications . . . designed to protect absentees by blocking unwarranted or overbroad class definitions." *Amchem Prods., Inc.*, 521 U.S. at 620.

## III.    DISCUSSION

Plaintiffs now move for final approval of the settlement agreement and seek the following: (1) the certification of the class for settlement purposes; (2) the approval of the settlement as procedurally and substantively fair, reasonable and adequate; (3) the appointment of the named Plaintiffs as representatives of the class and their counsel as class counsel; (4) the approval of service awards for the named Plaintiffs; and (5) the award of fees and costs to the class counsel.

## A. Certification Settlement Class for Settlement Purposes

As addressed above, the settlement-only class certification inquiry requires this Court to "demand undiluted, even heightened, attention in the settlement context" to Rule 23's "specifications . . . designed to protect absentees by blocking unwarranted or overbroad class definitions." *Amchem Prods.*, Inc., 521 U.S. at 620. As a result, the Court must ensure that the class meets the requirements of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

Rule 23(a) of the Federal Rules of Civil Procedure requires that any putative class be "so numerous that joinder of all members is impracticable;" that "there are questions of law or fact common to the class;" that the representative parties and their claims and defenses are typical of the class as a whole; and that "the representative parties will fairly and adequately protect the interests of the class." Additionally, under Rule 23, the class must be ascertainable. *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 30, 44–45 (2d Cir. 2006).

Finally, Rule 23(b)(3) of the Federal Rules of Civil Procedure requires that, before certifying a class, a court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### 1. Numerosity

In order to certify any class under Rule 23, the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, the class includes approximately 490,000 class members, Pls. Mem. at 4, satisfying the numerosity requirement of Rule 23(a)(1). *See, e.g., Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) ("Because numerosity is presumed at a level of 40 members . . . whether viewed as 700 tax-collecting

jurisdictions or 300 assessing jurisdictions, the number of defendants vastly exceeds this

threshold. Numerosity is therefore satisfied.").

### 2.    Commonality

Rule 23(a)(2) of the Federal Rules of Civil Procedure requires that there be "questions of

law or fact common to the class." As the Supreme Court has held:

> Commonality requires the plaintiff to demonstrate that the class
> members have suffered the same injury. This does not mean merely
> that they have all suffered a violation of the same provision of law.
> . . . Their claims must depend upon a common contention — for
> example, the assertion of discriminatory bias on the part of the same
> supervisor of such a nature that it is capable of classwide resolution
> — which means that determination of its truth or falsity will resolve
> an issue that is central to the validity of each one of the claims in
> one stroke.

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011) (internal citations and quotations

omitted).

Here, Plaintiffs have established common questions of law and fact, regarding whether

NAPG advertised misleading and deceptive rates, as well as whether NAPG failed to offer

customers rates consistent with their contracts. Finally, there are common issues of evidence and

proof that would ensure that "determination of its truth or falsity will resolve an issue that is

central to the validity of each one of the claims in one stroke." *Id.* at 350.

### 3.    Typicality

"Generally speaking, typicality determines whether a sufficient relationship exists

between the injury to the named plaintiff and the conduct affecting the class so that the court

may properly attribute a collective nature to the challenged conduct." 1 Newberg on Class

Actions § 3:29 (5th ed.). In the Second Circuit, "Rule 23(a)(3)'s typicality requirement is

satisfied when each class member's claim arises from the same course of events and each class

member makes similar legal arguments to prove the defendant's liability." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993).

Here, Defendant's conduct was "directed at or affected both the named plaintiff and the class sought to be represented." *Id.* at 936–937. NAPG made certain representation that its rates would be a market based variable rate; Plaintiffs allege that these representations were false and misleading, both to them and to class members. Pls. Preliminary Certification Mem. at 20-21. The Court therefore holds that the Plaintiffs meet Rule 23(a)(3)'s typicality requirements.

### 4.      Adequacy of Representative

In order to certify a class, Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006). Additionally, courts often examine whether proposed class counsel are qualified.

Both requirements are met here. No conflict between and among the representatives of the class has been identified. Throughout the litigation, Plaintiffs have appeared to represent the interests of their fellow class members. The plaintiffs also have vigorously pursued the claims of the class. *See* Izard Decl. ¶ 12, ECF No. 130-2.

Additionally, class counsel is competent. *See* 1 Newberg on Class Actions § 3:54 (5th ed.) ("Adequacy of counsel asks whether the attorneys who seek to represent the class are competent to do the job."). Each firm has extensive experience litigating class actions and representing named plaintiffs. *See* Izard, Kindall & Raabe LLP Firm Resume, Robert Izard Decl. Ex. A, ECF No. 130-2; Finkelstein, Blankinship, Frei-Pearson & Garber, LLP Firm Resume,

Blankinship Decl., ECF No. 130-3; Mazie Slater Katz & Freeman, LLC Firm Resume, Mendelsohn Decl., ECF No. 130-5. And, as this Court has previously recognized, "Class Counsel in this case is comprised of attorneys and law firms that are national leaders in class action litigation . . . ." *Kemp-DeLisser v. Saint Francis Hosp. & Med. Ctr.*, No. 15-cv-1113 (VAB), 2016 WL 6542707, at *16 (D. Conn. Nov. 3, 2016)

### 5.    Ascertainability

The Second Circuit has "'recognized an implied requirement of ascertainability in Rule 23,' which demands that a class be 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017) (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (internal quotation marks and citations omitted). As addressed at preliminary approval, the class is defined solely with reference to objective criteria. It is also feasible to determine class membership during the Class Period: NAPG has maintained identifying information—names, addresses, and the number of bills received—for all of its customers who purchased electricity or natural gas.

### 6.    Predominance and Superiority under Rule 23(b)(3)

Plaintiffs seek certification under Rule 23(b)(3). *See* Preliminary Settlement Approval Order at 10. In order to certify a (b)(3) class, a court must find that "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "Predominance is

satisfied 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting *In re U.S. Foodservice Inc. Pricing Litig.,* 729 F.3d at 118.).

 The class at issue here asserts a variety of state law claims but, primarily, rests on breach of contract claims. While claims arising under different contracts and the contract law provisions of different states might overwhelm the common questions of law or fact, the Second Circuit has concluded that breach of contract classes may be maintained under Rule 23(b)(3). *See In re U.S. Foodservice Inc. Pricing Litig.,* 729 F.3d 108, 125 (2d Cir. 2013). The class in *In re U.S. Foodservice* sought to bring a multi-state action, and Defendant challenged certification by arguing that resolving the claims would involve individual inquiries into the contracts, as well as variation in the law of each of the states where the class lived. *Id.* at 124–125.

 The Second Circuit rejected these claims and affirmed certification. First, it noted that each state applied the Uniform Commercial Code, and therefore there would be minimal variation between the states. *Id.* at 127 ("Here, they do not. As courts have noted, state contract law defines breach consistently such that the question will usually be the same in all jurisdictions."). Second, the court "agree[d] with the district court that the question of breach with regard to plaintiffs' contract claims will focus predominantly on common evidence to determine whether, in fact, USF used controlled middlemen to inflate invoice prices and whether such a practice departs from prevailing commercial standards of fair dealing so as to constitute a breach." *Id.* at 125. Ultimately, then, "[s]ince the record does not indicate the existence of material differences in contract language or other significant individualized evidence, we

conclude that the district court did not abuse its discretion in concluding that common issues will predominate over any individual issues, and that USF's claim to the contrary should be rejected." *Id.* at 126.

Similarly, here, the primary contention is that NAPG breached its consumer contract: "Either Defendant breached the uniform language of its form consumer contract, or it did not." Pls. Suppl. Br. at 9, ECF No. 120. As the Court noted when it granted preliminary certification, claims here would "focus predominately on common evidence" to determine whether NAPG was liable and rest on breach of contract claims where there is not significant variation. *In re U.S. Foodservice Inc.*, 729 F.3d at 125.[3]

A class action is also clearly superior here to individual actions. The individual claims are too small to be brought absent the class action; they are the type of small claims that represent the "very core of the class action mechanism . . . ." *Amchem*, 521 U.S. at 617. The common evidence and question of law and fact also ensure that a class would be efficient and preserve judicial resources, especially given is geographical scope and the number of individuals in the class. *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 139 (S.D.N.Y. 2008) (finding

_____

[3] The Court notes that Plaintiffs had asserted claims arising under state consumer protection statutes, and the release in this case would release these claims, as well as under state laws where there was no named plaintiff. The Second Circuit recently reversed certification of a class solely based on state consumer protection laws because the court was "not convinced that the district court here undertook the requisite considered analysis of the variations in state law and the potential need for subclasses that might result from those variations. *Langan v. Johnson & Johnson Consumer Companies, Inc.*, No. 17-1605, 2018 WL 3542624, at *8 (2d Cir. July 24, 2018). Unlike the case here, *Langan* did not address breach of contract claims, and so *In Re Foodservice*'s holding is more applicable here. Additionally, *Langan* addressed certification for trial, rather than certification for settlement. It is well-settled that Plaintiffs may release that they themselves could not bring. *See TBK Partners, LTD. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982) ("As long as the overall settlement is found to be fair and class members were given sufficient notice and opportunity to object to the fairness of the release, we see no reason why the judgment upon settlement cannot bar a claim that would have to be based on the identical factual predicate as that underlying the claims in the settled class action.").

class action the superior method of adjudication where proposed class was large, geographical dispersed, and the cost of pursuing individual litigation was not feasible).

As a result, the class may be appropriately certified for settlement purposes under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. The Court grants Plaintiffs motion with respect to the certification of the class for settlement purposes.

### B.      Approval of the Settlement Agreement

Rule 23(e) of the Federal Rules of Civil Procedure requires that "the court may approve [a settlement proposal] only after a hearing and on finding that it is fair, reasonable, and adequate." Courts often look to both procedural and substantive considerations in determining whether a given settlement agreement is "fair, reasonable, and adequate." *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 194 (S.D.N.Y. 2012).

For procedural fairness, a presumption of fairness, adequacy and reasonableness "may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 116 (2d Cir. 2005) (internal citations omitted).

Here that presumption is met. The parties engaged in extensive settlement discussions in this matter and its companion cases beginning in 2015, including multiple mediation and private settlement attempts. *See* Pls. Mot. at 14. Counsel are qualified, with extensive class action experience. *See* Izard, Kindall & Raabe LLP Firm Resume, Robert Izard Decl. Ex. A, ECF No. 130-2; Finkelstein, Blankinship, Frei-Pearson & Garber, LLP Firm Resume, Blankinship Decl., ECF No. 130-3. Finally, negotiations began — and continued — throughout extensive discovery, which included depositions of fact and expert witnesses, expert reports, class certification

motions and appeals of various aspects of the pending cases. *See* Pls. Mem. at 2. The

presumption of fairness therefore attaches.

For substantive fairness, courts in the Second Circuit "examine the fairness, adequacy,

and reasonableness of a class settlement according to the '*Grinnell* factors.'" *Wal-Mart*, 396 F.3d

at 117. These nine factors include:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement;
> (3) the stage of the proceedings and the amount of discovery completed;
> (4) the risks of establishing liability;
> (5) the risks of establishing damages;
> (6) the risks of maintaining the class action through the trial;
> (7) the ability of the defendants to withstand a greater judgment;
> (8) the range of reasonableness of the settlement fund in light of the best possible recovery;
> (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)).

As addressed below, the Court finds that these factors weigh in favor of approving the

settlement agreement under Rule 23(e) of the Federal Rules.

## 1. Complexity, Expense, and Likely Duration of Litigation

The first *Grinnell* factor requires the Court to consider the complexity, expense and likely

duration of the litigation. *Wal-Mart*, 396 F.3d at 117. "Most class actions are inherently complex

and settlement avoids the costs, delays and multitude of other problems associated with them"

and courts therefore favor class action settlements. *In re Austrian & German Bank Holocaust

Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), *aff'd sub nom. D'Amato v. Deutsche Bank*, 236

F.3d 78 (2d Cir. 2001).

Plaintiffs argue that the case is complex. The class includes all current and former NAPG customers over a five-year period. In support of the claims, the parties have also spent extensive time and money litigating the cases that the settlement would resolve. *See, e.g. In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y.), *aff'd sub nom. In re PaineWebber Inc. Ltd. P'ships Litig.*, 117 F.3d 721 (2d Cir. 1997) (holding that first element of *Grinnell* supports approval where parties had litigated for "nearly 1,000 days" and "consumed large sums of money and many thousands of hours of labor."). Plaintiffs' counsel alone avers that they have collectively spent 6,805.4 hours in litigating these cases. *See* Pls. Mem. at 29. That figure "will only escalate" if the case went to trial and, ultimately any subsequent appeal. *In re PaineWebber Ltd.*, 171 F.R.D. at 126.

As a result, the first *Grinnell* factors clearly supports approving the settlement.

### 2.    Reaction of the Class to the Settlement

"One of the factors most courts consider is the reaction of the absent class members, specifically the quality and quantity of any objections and the quantity of class members who opt out." 4 Newberg on Class Actions § 13:54 (5th ed.). Courts may consider two reactions: opt-outs and objections. *Id.* "If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." *Wal-Mart*, 396 F.3d at 118 (quoting 4 NEWBERG § 11.41).

Here, there are no objections to the settlement, and only seventeen of the 491,126 class members have opted out. *See* Pls. Status Report at 1–2, ECF No. 131. These figures strongly support approving the settlement in this case. *See Wal-Mart*, 396 F.3d at 118 (noting eighteen objections out of five million individuals notified of settlement and stating that "[i]f only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the

settlement.") (quoting 4 NEWBERG § 11.41); *see also Sykes v. Harris*, No. 09 Civ. 8486 (DC),

2016 WL 3030156, at *12 (S.D.N.Y. May 24, 2016) (approving settlement where "a miniscule

number" of plaintiffs — 38 individuals out of a potential 215,000 class members — requested

exclusions); *Charron*, 874 F. Supp. 2d at 197 (S.D.N.Y. 2012) (approving settlement where

"fewer than 1% of the tenants who received notice opted out of the lawsuit, and an even smaller

percentage objected.").

### 3. The Stage of the Proceedings and the Amount of Discovery Completed

As the Court noted at the preliminary approval stage, and as apparent from the procedural

history above, this case has been pending for a long time, and it has been subject to extensive

discovery in multiple fora. *See, e.g.*, Pls. Mem. at 2 (noting discovery conducted). With several

different matters pending, the parties conducted fact and expert depositions, multiple class

certification motions, and summary judgment proceedings. *Id*. In this case alone, before

settlement, Plaintiffs moved for class certification. *See* Pls. Mot. Class Cert., ECF No. 82.

Defendant moved for summary judgment. Def. Mot. for Summ. J., ECF No. 105. In a related

action, *Zahn v. North American Power & Gas*, LLC, No. 14-cv-8370 (N.D. Ill., filed October 24,

2014), the parties appealed to the Seventh Circuit, which certified a question to the Illinois

Supreme Court. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1086 (7th Cir. 2017)

(certifying question about whether Illinois Commerce Commission possessed exclusive

jurisdiction over claim).

In short, the parties "entered into settlement only after a thorough understanding of their

case." *Wal-Mart Stores, Inc.*, 396 F.3d at 118 (2d Cir. 2005). This factor weighs in favor of

approval. *Accord Thompson v. Metro. Life Ins. Co*., 216 F.R.D. 55, 62 (S.D.N.Y. 2003) ("With

respect to the third factor, defendant notes that the proposed settlement was reached after over a

year of hard fought litigation, in which some 450,000 pages of documents were produced, 31

depositions, including 22 current or former representatives of Metropolitan, were taken, and motions for summary judgment and class certification had been considered.").

### 4. The Risks of Establishing Liability and Damages

Plaintiffs argue "Defendant has raised several arguments that, if accepted by the Court or jury, would undermine or eliminate Plaintiffs' claims. *See* Pls. Mem. at 20–21. Defendant argues that it adequately disclosed its rates, and that long-time customers should have been aware of the rates at issue. *Id.* Additionally, as evidenced by its summary judgment briefing, NAPG has contested Plaintiffs' expert claim and damages model. *Id.* at 21; *see also* Defs. Mem. in Supp., ECF No. 107. Plaintiffs note *Richards v. Direct Energy Servs., LLC*, 246 F. Supp. 3d 538, 542–43 (D. Conn. 2017), where this Court granted summary judgment in a putative class action related to utility rates. Plaintiffs argue, while they dispute the relevance of *Richards*' holding to the case at hand, "the fact remains that Plaintiffs and the Class face the substantial risk of recovering ***nothing*** but for the Settlement." Pls. Mem. at 21 (emphasis in original).

The Court credits these arguments. Without addressing the merits of the summary judgment briefing, the Court notes "litigation inherently involves risk." *In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y.1997). The proof in this case is also heavily dependent on expert testimony in relation to complex subject matter. This consideration "always adds an element of uncertainty as to the outcome." *Thompson*, 216 F.R.D. at 63. Factors four and five of the *Grinnell* test therefore weigh in favor of approving the settlement.

### 5. The Risks of Maintaining the Class Action Through Trial

"One of the factors most courts consider is how certain the court is that the class certification requirements are met and maintainable." 4 Newberg on Class Actions § 13:51. This

consideration is separate, although related, to the Court's determination above that the class

should be certified for settlement purposes. *Id.*

Plaintiffs point to NAPG's arguments that "purported differences between individual

contracts, state laws, and purchaser geographies and rate experiences create individual issues that

predominate over class-wide issues." Pls. Mem. at 22. Plaintiffs may dispute this argument, but

they note here that it poses significant risk to maintaining a class through trial.

Additionally, the Court notes that the class definition here sweeps beyond the claims that

were pending in this case. It is possible that — while the Court has determined that the claims

are appropriate for certification and, ultimately, for release here — the same claims might not be

maintained at trial because of manageability concerns. *Cf. In re Warfarin Sodium Antitrust*

*Litig.*, 391 F.3d 516, 537 (3d Cir. 2004) ("Although Appellants' concerns about the

manageability of a multistate class of consumers and TPPs, as we discussed above, did not pose

a problem for the certification of a settlement class, there is a significant risk that such a class

would create intractable management problems if it were to become a litigation class, and

therefore be decertified.").

## 6. NAPG's Ability to Withstand a Greater Judgment

The parties have continually noted that they felt there are "substantial concerns that

NAPG could bear the enormously large statutory and compensatory damages award that could

be assessed were the cases to proceed through trial." Pls. Mem. at 21–22. This information has

not been put before the Court.

The Court notes, however, that this factor "standing alone, does not suggest that the

settlement is unfair," especially where the "other Grinnell factors weigh heavily in favor of

settlement . . . ." *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001). Therefore, given the

application of the other *Grinnell* factors in this case, the Court does not need to look to whether NAPG truly could have withstood a larger judgment. The Court may still approve the settlement agreement. *Accord Kemp-DeLisser*, 2016 WL 6542707, at *10 ("Thus, even if the Defendants here could afford to pay more than the $107 million Settlement Amount, this does not prevent the Court from approving this Settlement as fair and reasonable.").

### 7. The Range of Reasonableness of the Settlement Fund

The final *Grinnell* factors require examination of the "range of reasonableness" of the settlement fund "in light of the best possible recovery" and "in light of all the attendant risks of litigation." *Wal-Mart Stores, Inc.*, 396 F.3d at 117. A court should "consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *Grinnell*, 495 F.2d at 462.

Plaintiffs summarize the settlement's value for claimants as of June 8, 2018. *See* Pls. Mem. at 18. A total of 16,890 claims have been submitted and the average claimant will receive $50:

- Approximately 4,700 will receive between $2.00 and $9.99;

- Approximately 4,500 will receive between $10.00 and $29.99;

- Approximately 2,900 will receive between $30.00 and $49.99;

- Approximately 2,400 class members will receive over $100; and,

- Approximately 200 class members will receive over $300.

*Id.*

Plaintiffs also note that their expert calculated that the maximum damage was $.015 per kilowatt hour for electric supply service, although NAPG continues to contest this figure. Pls.

Mem. at 17–19. The final settlement amount awarded Plaintiffs $0.00351 per kilowatt hour for electric supply service. Given this calculation, which was contested, the settlement figure represents approximately 23 per cent of the maximum recovery. *Id.* at 17. Courts have regularly considered such recoveries appropriate. *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 484 (S.D.N.Y. 2009) (approving settlement that represented two percent of plaintiffs' damages expert's calculation); *In re Interpublic Sec. Litig.,* No. 02 Civ.6527 (DLC), 2004 WL 2397190, at *8 (S.D.N.Y. Oct. 26, 2004) ("Therefore, while the Gross Settlement Fund reflects only ten to twenty percent of lead plaintiff's aggressive damages estimate, the securities settlement sits comfortably within the range of reasonableness.").

As a result, the *Grinnell* factors — taken as a whole — support finding the settlement substantively fair, reasonable, and adequate. The Court grants Plaintiffs motion to the extent it seeks final approval of the settlement agreement.

### C. Service Awards, Attorneys' Fees and Costs

There remain two outstanding questions of compensation. First, the named Plaintiffs seek an award of $5,000 each as an enhancement. *See* Pls. Mem. at 37–39. Second, class counsel seeks approval of an award of $3,154,805.12 in attorneys' fees and $474,194.88 for expenses. *Id.* at 24-37. The Court will approve these requests.

### 1. Named Plaintiff Enhancement Awards

Plaintiffs seek an award of $5,000 in service awards. Pls. Mem. at 37. They argue that, under the Settlement Agreement, "NAPG has agreed to pay these awards using its own resources, which means, as with Class Counsel's request for attorneys' fees, these payments will not reduce the benefits provided to Class Members." *Id.*

"Service awards are common in class action cases and serve to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiffs." *Beckman v. KeyBank, N.A*., 293 F.R.D. 467, 483 (S.D.N.Y. 2013) (affirming service awards of $7,500 and $5,000, to be paid from settlement fund, for named plaintiffs in putative wage and hour class action). Courts in the Second Circuit have approved a wide range of incentive awards. *See, e.g.*, *Karic v. Major Auto. Cos., Inc*., No. 09 CV 5708 (CLP), 2016 WL 1745037, at *8 (E.D.N.Y. Apr. 27, 2016) (collecting cases in wage and hour class action, and noting awards between $10,000 and $40,000).

Here, Plaintiffs have remained active in the case, providing advice to counsel and participating in settlement and mediation discussions. *See* Izard Decl. ¶ 12. A service award of $5,000 in recognition of their time and efforts, and in light of the overall settlement, is warranted. *See Gross v. Washington Mut. Bank, F.A.*, No. 02 CV 4135 (RML), 2006 WL 318814, at *6 (E.D.N.Y. Feb. 9, 2006) (approving $5,000 fee in Fair Debt Collection Practices Act case because "[t]his award is consistent with the range of awards made in favor of class representatives in similar cases."); *see also Dornberger v. Metro. Life Ins. Co.,* 203 F.R.D. 118, 124 (S.D.N.Y.2001) (approving award of $10,000 for named plaintiff involved in a multi-million dollar settlement).

### 2.     Attorneys' Fees

Plaintiffs seek approval for $3,154,805.12 in attorneys' fees. Pls. Mem. at 29. The notice sent to class provided for a maximum award of fees and expenses, including any service award to named plaintiffs, of $3,669,000. *Id.* at 36. Plaintiffs note that the attorneys' fees portion of this award would represent 16 per cent of the total value of the settlement, and argue that this is

reasonable, "especially given the complexity and novelty of the case, the attendant litigation risks, and the effort Class Counsel expended to reach the Settlement . . . ." *Id.* at 30–31. They therefore argue approval of the fee, as a percentage of the overall class fund, is warranted.

Courts may approve fees in common fund cases under of one of two calculations: either a "percentage of the fund" method or a "lodestar" method. *Wal-Mart Stores, Inc.,* 396 F.3d at 121; *see also McDaniel v. Cty. of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010) ("[I]t remains the law in this Circuit that courts may award attorneys' fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund' method."). As this Court has previously noted, however, "[m]any courts in the Second Circuit favor the percentage of fund method for awarding attorneys' fees in class action settlements." *Kemp-DeLisser,* 2016 WL 6542707, at *15 (citing *Wal-Mart Stores, Inc.*, 396 F.3d at 121).

Potential fee awards are examined under the *Goldberg* factors. *Wal-Mart Stores, Inc.* 396 F.3d at 121–122 (citing *Goldberger v. Integrated Resource, Inc. et al*, 209 F.3d 43, 50 (2d Cir. 2000)). The six factors include: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Wal-Mart Stores, Inc*., 396 F.3d at 121. The *Goldberger* factors support the reasonableness of the fee in this matter.

First, counsel has litigated the *Edwards* action for nearly four years, and the settlement represents the effort of multiple cases elsewhere. According to documentation submitted in connection with their motions, Plaintiffs' counsel represents that they have spent a total of 6,805.4 hours of attorney time. *See* Pls. Mem. at 29 (citing documentary evidence of hours spent). This factor weighs in favor of the proposed fee award.

Second, as addressed in the Court's discussion of class certification and approval of the terms of the settlement above, the case presents a large settlement class and a multi-million dollar fund, relying primarily on expert evidence to address a complex theory of liability. *See, e.g.*, Pls. Mem. at 32 ("The magnitude and complexity of this action is even greater because of the multiple states in which NAPG is operating, differences in state law, the differencing contracts that NAPG used in each state and over time, and the prevailing electric and gas rates over time."). The Court credits this argument, and holds the second factor weighs in favor of the proposed fee.

Third, the Court must consider the risk of the litigation. As addressed above when considering the fairness of the settlement, there was significant risk in litigating these cases. The proof relied primarily on expert testimony, which often increases the risk that a jury may not find liability or would limit damages. *Thompson*, 216 F.R.D. at 63 (noting that relying on expert testimony "always adds an element of uncertainty as to the outcome."). It is also possible, as addressed above, that the class would present manageability concerns that absent settlement might have undermined the class action. *Cf. Langan v. Johnson & Johnson Consumer Cos., Inc.*, No. 17-1605, 2018 WL 3542624, at *8 (2d Cir. July 24, 2018) ("We are not convinced that the district court here undertook the requisite considered analysis of the variations in state law and the potential need for subclasses that might result from those variations."). Given these risks, the third *Golberg* factor counsels in favor of approval.

Fourth, the Court must consider the quality of counsel. As this Court has previously noted, "Class Counsel in this case is comprised of attorneys and law firms that are national leaders in class action litigation . . . ." *Kemp-DeLisser*, 2016 WL 6542707, at *16. Additionally, "the quality of representation is best measured by results, and that such results may be calculated

by comparing the extent of possible recovery with the amount of actual verdict or settlement." *Goldberger*, 209 F.3d at 55. Here, Plaintiffs' counsel secured a significant settlement for a large class of individuals, with a total cash value of $16,053,000. *See* Pls. Mem. at 32.

The fifth *Goldberg* factor requires consideration of the "the requested fee in relation to the settlement." *Goldberger*, 209 F.3d at 50. In determining the total value of the settlement, courts generally consider the full value of the fund, not only the funds claimed, and the total amount of both the potential attorneys' fees and the sum made available to the class. *See, e.g.*, *Masters v. Wilhelmina Model Agency, Inc*., 473 F.3d 423, 437 (2d Cir. 2007) ("The entire Fund, and not some portion thereof, is created through the efforts of counsel at the instigation of the entire class. An allocation of fees by percentage should therefore be awarded on the basis of the total funds made available, whether claimed or not. We side with the circuits that take this approach."); *Kiefer v. Moran Foods, LLC*, No. 12-CV-756 (WGY), 2014 WL 3882504, at *8 (D. Conn. Aug. 5, 2014) ("In applying the common fund method, the Supreme Court, the Second Circuit, and other Circuit Courts have held that it is appropriate to award attorneys' fees as a percentage of the entire maximum gross settlement fund, even where amounts to be paid to settlement class members who do not file claims will revert to the Defendants."); *Torres v. Gristede's Operating Corp.*, 519 F. App'x 1, 5 (2d Cir. 2013) (calculating total award as inclusive of attorneys' fees and costs).

Here, the total value of the settlement — fees, costs, and potential value for class members — equals $19,722,000. *See* Pls. Mem. at 29. The attorney fee award would thus represent 16 per cent of the total award or 19.7 per cent of the $16,053,000 payments available to the class. *Id.* This figure is significantly lower than the percentages regularly awarded within the Second Circuit. *See In re Sumitomo Copper Litigation,* 146 F. Supp. 2d 436 (S.D.N.Y. 2001)

(awarding approximately one-third of settlement as attorney fee award in commodities case); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini,* 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003) (approving fee award of one-third in securities class action); *see also Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 189 (W.D.N.Y. 2005) (approving of fee award at 40% of the settlement fund); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 351 (S.D.N.Y. 2014) (noting median fee of 25 to 28 per cent of the fund in ERISA cases).

Finally, the sixth *Goldberg* factor requires the Court to consider the public policy implications of the proposed fee. "There is also commendable sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest." *Goldberger,* 209 F.3d at 51. Here, the class action was necessary given the range of relief that was available to individual class members. Without adequate counsel — and appropriate incentives for that counsel — this case might not have been brought. Class Counsel's fees "should reflect the important public policy goal of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest." *Colgate-Palmolive*, 36 F. Supp. 3d at 352 (discussing ERISA class action) (internal quotation marks and citations omitted). Public policy certainly supports providing that incentive, absent a windfall, in this case the sixth factor supports approving the fee structure in this case.

As a result, the Court determines that the Plaintiffs' fee award of $3,154,805.12 in attorneys' fees is reasonable.

### 3.        Fee Request

Rule 23(h) of the Federal Rules of Civil Procedure provides for the award of "nontaxable costs authorized by law or by the parties' agreement. Here, Plaintiffs seek $474,194.88 in costs, which they argue were "reasonable and necessary to the prosecution of these actions" and are

typical of the costs usually billed to clients. *See* Pls. Mem. at 36. These fees include expenses related to experts, court fees, copying, research and discovery, transcripts, travel, and other costs associated with litigation. *See* Izard Decl. ¶ 17; Blankinship Decl. ¶ 22; Mendelsohn Decl. ¶ 21; Schelkpf Dec. ¶ 21.

"Courts may reimburse counsel for expenses reasonably and necessarily incurred in litigating a class action." *Kemp-DeLisser*, 2016 WL 6542707, at \*18 (D. Conn. Nov. 3, 2016); *see also In re Marsh ERISA Litig.*, 265 F.R.D. 128, 150 (S.D.N.Y. 2010) ("It is well-established that counsel who create a common fund like this one are entitled to the reimbursement of litigation costs and expenses.").

The costs here are reasonable and accrued during the course of litigation. The Court will therefore grant Plaintiffs' motion with respect to the award of $474,195.88 in costs.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Final Approval of the Class Action Settlement, ECF NO. 130 is **GRANTED.**

Furthermore, **IT IS HERBY ORDERED AND ADJUDGED AS FOLLOWS**:

1.  For purposes of this Final Judgment and Order of Dismissal ("Judgment"), the Court adopts all defined terms as set forth in the Settlement Agreement filed in this case.

2.  The Court has jurisdiction over the subject matter of the litigation, the Representative Plaintiffs, the Class Members, and the Released Persons ("the Settling Parties").

3.  With respect to the Settlement Class and for purposes of approving this Settlement only, this Court finds as to the Settlement Class that the requirements

of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure have been met in this case.

4.    Under Rule 23 of the Federal Rules of Civil Procedure, and for purposes of, and solely in connection with, the Settlement, the Court certifies this action as a class action on behalf of the following Settlement Class:

> All persons who, at any time from February 20, 2012 to June 5, 2017 were customers of NAPG and paid NAPG variable rates for electricity and/or natural gas in Connecticut, Illinois, Maryland, Maine, New Hampshire, New Jersey, Ohio, Pennsylvania, Rhode Island, Georgia or Texas.

5.    The Parties have complied fully with the notice provisions of the Class Action Fairness Act of 2005, 28 U.S.C. § 1715.

6.    Based on evidence and other material submitted in conjunction with the Final Approval Hearing, the Court hereby finds and concludes that (1) the Short Form Notice was disseminated to members of the Settlement Class in accordance with the Settlement Agreement and the Court's Preliminary Approval Order, and (2) the Long Form Notice, the Claim Form, and the Settlement Website complied with this Court's Preliminary Approval Order.

7.    The Court finds and concludes that the Short Form Notice, the Long Form Notice, the Claim Form, the Settlement Website, and all other aspects of the notice, opt-out and claims submission procedures set forth in the Settlement Agreement fully satisfy Rule 23 of the Federal Rules of Civil Procedure and the requirements of due process, were the best notice practicable under the circumstances, and support the Court's exercise of jurisdiction over the Settlement Class and the Settlement Class Members.

8.      Seventeen persons who fall within the definition of the Settlement Class have requested to opt out of the Settlement and have complied with the procedures established by the Settlement Agreement and this Court. These individuals will not be bound by the terms of the Settlement Agreement:

1.      SHAKELIA SUMRELL

2.      ROSALIND TOBIN

3.      RICHARD DALOE

4.      PHYLLIS KOLENDA

5.      DARRELL GREENE JR

6.      NERWYN WHYNOT

7.      JERRY L ROWE

8.      GEORGE E CHENIER JR

9.      ROBERT WEIR

10.     JAMA ROTHSCHILD

11.     REGINALD J WILLIAMS

12.     ALDEN R WITT

13.     ROBERT W NEFF

14.     GEORGE P TAYLOR

15.     TAMMY HELD

16.     TERESA MAROIS

17.     JOANNE COSTABILE

9.      The Court finds that the Settlement Agreement is the product of arm's length settlement negotiations between the Settling Parties.

10. The Court finds and concludes that the Settlement is fair, reasonable, and adequate and should be approved.

11. The Court hereby approves the Settlement (as set forth in the Settlement Agreement), the Releases, and all other terms in the Settlement Agreement, as fair, just, reasonable and adequate as to the Settling Parties. The Parties are directed to perform in accordance with the terms set forth in the Settlement Agreement. However, without seeking further Court approval, the Settling Parties may jointly agree to make changes to the Settlement Agreement, including to the manner in which the claims process shall be administered, provided that those changes do not reduce the benefits to which Settlement Class Members may be entitled, increase the burden on Settlement Class Members in making a Claim, or otherwise materially alter the Settling Parties' obligations under the Settlement and the Settlement Agreement.

12. By this Judgment, the Releasing Parties shall be deemed to have (and by operation of the Judgment shall have) fully finally, and forever released, relinquished and discharged all Released Claims against the Released Persons.

13. This action is dismissed with prejudice. The Settling Parties are to bear their own attorney's fees and costs, except as otherwise expressly provided in the Settlement Agreement and in this Judgment.

14. Neither the Settlement Agreement, nor any act performed or document executed under or in furtherance of the settlement: (i) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claim, or of any wrongdoing or liability of the Released Persons; or (ii) is or may be deemed

to be or may be used as an admission of, or evidence of, any fault or omission of the Released Persons in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. The Released Persons may file the Settlement Agreement and/or the Judgment from this litigation in any other action that may be brought against them in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.

15.  If for any reason the Effective Date does not occur, then (1) the certification of the Settlement Class shall be deemed vacated, (2) the certification of the Settlement Class for settlement purposes shall not be considered as a factor in connection with any subsequent class certification issues, and (3) the Settling Parties shall return to the status quo ante in the litigation as it existed on March 30, 2018, without prejudice to the right of any of the Settling Parties to assert any right or position that could have been asserted, if the Settlement had never been reached or proposed to the Court.

16.  Plaintiffs have requested $3,154,805.12 in attorneys' fees for Class Counsel. Upon consideration of Plaintiffs' Motion for an Award of Fees, the Motion is GRANTED. Consistent with Section 7.5 of the Settlement Agreement, Defendants shall pay Class Counsel $3,154,805.12 in attorneys' fees, consistent with the terms of the Settlement Agreement. Under the Settlement Agreement, this award shall be paid separate and apart from the amounts received by members of the Settling Class.

17. Plaintiffs have requested $474,194.88 in expenses for Class Counsel. Upon consideration of Plaintiffs' Motion for an Award of Expenses, the Motion is GRANTED. Consistent with Section 7.5 of the Settlement Agreement, Defendants shall pay Class Counsel $474,194.88 in expenses, consistent with the terms of the Settlement Agreement. Per the Settlement Agreement, this award shall be paid separate and apart from the amounts received by members of the Settling Class.

18. Plaintiffs have requested $5,000 each as Plaintiff Service Awards. Upon consideration of Plaintiffs' request for Plaintiff Service Awards, the request is GRANTED. Consistent with the terms of Section 7.5 of the Settlement Agreement, Defendant shall pay Paul Edwards, Gerry Wendrovsky, Sandra Desrosiers, Linda Soffron, John Arcaro, Michael Tully, David Fritz and Peggy Zahn a Service Award in the amount of $5,000 each. Per the Settlement Agreement, these Service Awards shall be paid separate and apart from the amounts received by members of the Settling Class.

19. Within 120 days from the Effective Date, the Settlement Administrator shall destroy all personally identifying information about any Class Member in its possession, custody, or control, including (but not limited to) any list that the Settlement Administrator received from Defendant in connection with the Settlement Administrator's efforts to provide Notice to Class Members.

20. Each and every Class Member, and any Person actually or purportedly acting on behalf of any Class Member, is hereby permanently barred and enjoined from commencing, instituting, continuing, pursuing, maintaining, prosecuting, or

enforcing any Released Claims (including, without limitation, in any individual, class or putative class, representative or other action or proceeding), directly or indirectly, in any judicial, administrative, arbitral, or other forum, against the Released Persons. This permanent bar and injunction is necessary to protect and effectuate the Settlement Agreement, this Final Judgment, and this Court's authority to effectuate the Settlement Agreement, and is ordered in aid of this Court's jurisdiction and to protect its judgments.

21.   This document is a final, appealable order, and shall constitute a judgment for purposes of Rules 54 and 58 of the Federal Rules of Civil Procedure. By incorporating the Settlement Agreement's terms herein, the Court determines that this Final Judgment complies in all respect with Federal Rule of Civil Procedure 65(d)(1).

The Clerk of the Court is hereby directed to close this case.

**SO ORDERED** this 3rd day of August, 2018, in Bridgeport, Connecticut.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE